No. 04-214

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 30

THE SECOND INTERNATIONAL BAHA'I COUNCIL,

        Plaintiff and Appellant,

   v.

NEAL CHASE,

        Defendant and Respondent.

APPEAL FROM:    District Court of the Fourth Judicial District,
                       In and for the County of Missoula, Cause No. DV 2002-410
                       The Honorable John W. Larson, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

        Michael Sol, Sol & Wolfe Law Firm, Missoula, Montana

        For Respondent:

        Cynthia K. Smith, Smith & Jewell Law Offices, Missoula, Montana

                    Submitted on Briefs:  July 20, 2004

                           Decided:  February 15, 2005

Filed:

_____
                          Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1      The Second International Baha'i Council (the Council) appeals a judgment of the Fourth Judicial District Court, Missoula County, which dismissed its cause of action for want of subject-matter jurisdiction.

¶2      We reverse and remand for further proceedings consistent with this Opinion.

¶3      We address the following issue on appeal:

¶4      Did the District Court err by granting Neal Chase's motion to dismiss on the grounds that the First Amendment to the United States Constitution forbade the court to rule on the merits of the case?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5      The Council was organized in 1991 by Dr. Leland Jensen.  The parties consider Dr. Jensen to be an authoritative religious figure, and his writings to be binding on the Council. Dr. Jensen incorporated the Council in 1993 under Title 35, Chapter 2 of the Montana Code, the "Montana Nonprofit Corporation Act."[1]  Section 35-2-113 *et seq.*, MCA.  The Council is the ultimate authority for the hierarchical denomination or sect of the Baha'i faith known as the Baha'is Under the Provision of the Covenant, or BUPC.

¶6      A long-running controversy within the church over the title of "Guardian of the Faith" broke out into schism in December 2001.  The Guardian is considered by the parties to this

---

[1] The Council is not a "Religious Corporation Sole" pursuant to Title 35, Chapter 3 of the Montana Code.  Section 35-3-101 *et seq.*, MCA.  This fact, however, does not alter our analysis.

2

litigation to be the leader of the Baha'i faith; what is more important for present purposes, the Guardian is also the corporate president of the Council. Neal Chase (Chase) claims this title.

¶7     The Council filed its Complaint against Chase on April 26, 2002. The Complaint alleged that Chase wrongfully interfered with the conduct of the corporation and converted corporate property to his own use, including funds on deposit in the corporation's bank account, and claims economic and consequential damages arising from these alleged acts. The Council seeks an order granting damages against Chase for his alleged conversion of the property, including interest; an injunction forbidding Chase to represent to any party that he is a member, officer, or agent of the corporation for any purpose, or to use the name of the corporation for any purpose; costs of the suit and attorney's fees. The Council also seeks a determination that the corporate bank account belongs to the corporation and to its designated directors, officers, and agents.

¶8     Chase filed his motion to dismiss on July 15, 2003. He argued that a judicial resolution of this church property dispute would require the District Court to inquire into, interpret, and apply religious doctrine, a course of action forbidden to the civil courts by the First Amendment to the United States Constitution. The District Court granted this motion by Order dated September 29, 2003. This appeal followed.

## STANDARD OF REVIEW

¶9    A district court's determination that it lacks jurisdiction is a conclusion of law. *Threlkeld v. Colorado*, 2000 MT 369, ¶ 7, 303 Mont. 432, ¶ 7, 16 P.3d 359, ¶ 7. We review a district court's conclusions of law to determine whether the court's interpretation of the law is correct. *Carbon County v. Union Reserve Coal Co., Inc.* (1995), 271 Mont. 459, 469, 898 P.2d 680, 686.

## DISCUSSION

¶10    *Did the District Court err by granting Chase's motion to dismiss on the grounds that the First Amendment to the United States Constitution forbade the court to rule on the merits of the case?*

¶11    The First Amendment to the Constitution of the United States reads, in pertinent part:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]

¶12    The Free Exercise and Non-Establishment Clauses of the First Amendment have been applied to the several States by the Due Process Clause of the Fourteenth Amendment. *Cantwell v. Connecticut* (1940), 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (Free Exercise); *Everson v. Board of Education* (1947), 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (Non-Establishment). Their prohibitions concerning legislative acts were extended to judicial action in *Kreshik v. St. Nicholas Cathedral* (1960), 363 U.S. 190, 80 S.Ct. 1037, 4 L.Ed.2d 1140. *See Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church* (1969), 393 U.S. 440, 448-49, 89 S.Ct. 601, 606, 21 L.Ed.2d 658, 665.

¶13    The States have a legitimate interest in the peaceful resolution of property disputes, and their civil courts are generally proper forums for such resolution. *Jones v. Wolf* (1979), 443 U.S. 595, 602, 99 S.Ct. 3020, 3024-25, 61 L.Ed.2d 775, 783-84; *Presbyterian Church*, 393 U.S. at 445, 89 S.Ct. at 604, 21 L.Ed.2d at 663. Disputes involving church property can

4

pose special problems, however. Although not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment, *Presbyterian Church*, 393 U.S. at 449, 89 S.Ct. at 606, 21 L.Ed.2d at 665, the courts must exercise great care to avoid resolving such disputes on the basis of religious doctrine and practice, *Jones*, 443 U.S. at 602, 99 S.Ct. at 3025, 61 L.Ed.2d at 784 (citations omitted). To do otherwise risks involving the temporal sovereign in religious activity, one of the chief dangers which the Establishment Clause seeks to prevent. *Tilton v. Richardson* (1971), 403 U.S. 672, 677, 90 S.Ct. 2091, 2095, 29 L.Ed.2d 790, 798 (citing *Walz v. Tax Comm'n* (1970), 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697, 701); *see also Prebyterian Church*, 393 U.S. at 449, 89 S.Ct. at 606, 21 L.Ed.2d at 665. As one noted commentator has observed:

> Allocating religious choices to the unfettered consciences of individuals under the free exercise clause remains, in part, a means of assuring that church and state do not unite to create the many dangers and divisions often implicit in such an established union. Similarly, forbidding the excessive identification of church and state through the establishment clause remains, in part, a means of assuring that government does not excessively intrude upon religious liberty.

Laurence H. Tribe, American Constitutional Law §14-2, at 1157 (2d ed. 1988) [hereinafter Tribe].

¶14    The United States Supreme Court has recognized the potential incompatibility of these mandates on several occasions. *See, e.g.*, *Tilton*, 403 U.S. at 677, 91 S.Ct. at 2095, 29 L.Ed.2d at 798 (noting the "internal tension in the First Amendment between the Establishment Clause and the Free Exercise Clause"); *Walz*, 397 U.S. at 668-69, 90 S.Ct. at 1411, 25 L.Ed.2d at 701 (describing the religion clauses as "cast in absolute terms . . . either of which, if expanded to a logical extreme, would tend to clash with the other"). Professor Chemerinsky illustrates this tension with the following example:

5

> Government actions to facilitate free exercise might be challenged as impermissible establishments, and government efforts to refrain from establishing religion might be objected to as denying the free exercise of religion. For instance, if the government pays for and provides ministers for those in the armed services, it arguably is establishing religion; but if the government refuses to do so on these grounds, it arguably is denying free exercise of religion.

Erwin Chemerinsky, Constitutional Law: Principles and Policies §12.1.1, at 1140-41 (2d ed. 2002).

¶15     The Ninth Circuit recently addressed the potential for such inter-clausular conflict in the specific context of church property disputes. In *Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar* (1999), 179 F.3d 1244, the Court of Appeals cautioned that,

> [i]n avoiding the religious thicket, . . . we must be careful not to deprive religious organizations of all recourse to the protections of civil law that are available to all others. Such a deprivation would raise its own serious problems under the Free Exercise Clause. . . . It would also leave religious organizations at the mercy of anyone who appropriated their property with an assertion of religious right to it.

*Maktab*, 179 F.3d at 1248 (citing *Everson*, 330 U.S. at 16, 67 S.Ct. at 512, 91 L.Ed at 724); *see also* 66 Am.Jur.2d *Religious Societies* §1 at 428 (religious corporation an "artificial construction of the state" intended to facilitate the congregants' free exercise of their religion); Articles of Incorporation of the Council, Article III (Council's purpose to "administer the affairs of the Cause of Baha'u'llah for the benefit of the world-wide religious community"). Nonetheless, "States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions." *Presbyterian Church*, 393 U.S. at 449, 89 S.Ct. at 606, 21 L.Ed.2d at 665. If they have not so laid the groundwork for purely secular resolution of such a dispute, the civil court confronted with it cannot but decline jurisdiction.

¶16     In a series of cases culminating in *Jones*, the United States Supreme Court approved of two independent approaches to disputes involving church property. Civil courts may

defer to the decision-making authority of a hierarchical church. Under that approach, the court avoids entanglement in ecclesiastical controversy by accepting the judgment of the established decision-making body of the religious organization. *Maktab*, 179 F.3d at 1248 (citing *Serbian Eastern Orthodox Diocese v. Milivojevich* (1976), 426 U.S. 696, 708-09, 96 S.Ct. 2372, 2380, 49 L.Ed.2d 151, 162); *see also Lemon v. Kurtzman* (1971), 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745; Tribe §14-11, at 1231. This approach is most easily employed when there is no dispute between the parties concerning the hierarchical nature of the church or the identity of its decision-making body; when either is disputed on the basis of religious doctrine, however, the resolution of these threshold questions may require a court to intrude impermissibly into religious doctrinal issues. *Maktab*, 179 F.3d at 1248 (citing *Jones*, 443 U.S. at 605, 99 S.Ct. at 3026, 61 L.Ed.2d at 786; *Maryland and Virginia Eldership of Churches of God v. Church of God at Sharpsburg* (1970), 396 U.S. 367, 368-70, 90 S.Ct. 499, 500-01, 24 L.Ed.2d 582, 583-85 (Brennan, J., concurring)); *see also Presbyterian Church*, 393 U.S. at 449, 89 S.Ct. at 606, 21 L.Ed.2d at 665.

¶17    Alternatively, a court may resolve church property disputes by applying neutral, secular principles of property, trust, and corporate law when the instruments upon which those principles operate are at hand. Thus, no First Amendment issue arises when a court resolves a church property dispute by relying on state statutes concerning the holding of religious property, the language in the relevant deeds, and the terms of corporate charters of religious organizations. *Maktab*, 179 F.3d at 1249 (citing *Maryland and Virginia Eldership*).

> The key inquiry is whether church documents . . . contain express, secular language indicating what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy. If the documents contain both secular and non-secular language on such subjects, the court apparently must separate the secular language if possible. If the documents do contain express, secular language, separable from the non-secular language, then that language dictates the outcome.

Tribe §14-11, at 1238.

7

¶18 The *Jones* Court made clear, furthermore, that its approval of these approaches was not to the exclusion of all others. Rather, a State "may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." *Jones*, 443 U.S. at 602, 99 S.Ct. at 3025, 61 L.Ed.2d at 784 (*quoting Maryland and Virginia Eldership*, 396 U.S. at 368, 90 S.Ct. at 500, 24 L.Ed.2d at 584 (Brennan, J., concurring) (emphasis in original)).

¶19 Chase argues that any approach, otherwise reasonably calculated to resolve this dispute, would involve the civil courts in an impermissible examination, interpretation, and application of ecclesiastical doctrine. Specifically, Chase argues that we cannot direct the District Court to defer to the highest decision-making body of this church--that is, to the Council[2]--because the dispute itself calls the membership of the Council into question, and resolving this threshold issue would require the District Court to resolve a purely religious controversy. *See* ¶ 16, above. Neither, according to Chase, can we instruct the District Court to apply neutral principles to this dispute, because all the authoritative documents the interpretation of which might prescribe a solution are religious in nature. *See* ¶ 17, above. We disagree.

¶20 Chase views this church property dispute as involving two separate disputes: one over Board membership, the other over the religious title of Guardian, neither of which can be resolved by neutral means. He claims, first, that the Board members' failure to recognize him as the Guardian of the Faith amounts to "covenant-breaking"--that is, an action that conflicts with the doctrine of the Baha'i faith--and that this failure has automatically removed all the members from the Board due to spiritual incapacity. This state of affairs

---

[2] We will use the terms "Council" and "Board" as mutual equivalents, since the Bylaws identify the one with the other.

8

prevents a civil court from simply applying the everyday corporate-law principle of majority rule to this dispute. Secondly, Chase argues that being the Guardian vests him also with the presidency of the church corporation, and that, since the only relevant church documents place control over church property in the hands of the president, they fully authorized Chase to act regarding the corporation and to deal with its property as he did.

¶21 Were we to accept Chase's characterization of this case, the First Amendment would effectively insulate the dispute from resolution by a civil court, as he maintains. But Chase has not persuaded us that matters stand as he has framed them. Both Chase and the Council refer to a resolution, passed by the latter almost two years before it filed the instant suit against Chase, which bears directly on the Board-membership question. The resolution reads in relevant part:

> Whereas, Dr. Jensen held the exclusive right to remove members from this body during his lifetime,
>
> Therefore, the [Council] rules that even after Dr. Jensen's passing on, it is not within its sphere of jurisdiction to remove an appointed member of its own body but it does have the authority to adjudicate upon and enforce the Will and Testament and Dr. Jensen's instructions for the formation of this council. *In the case of Covenant Breaking*, the body finds that Dr. Jensen's appointments to this council are conditional upon not breaking the covenant. *Therefore* any of the members of this body *who are found through due process* to have broken the covenant have abandoned their position as a member of this council *and this council has the authority to enforce this reality* by acknowledging that according to the provisions of the Will and Testament that individual is no longer a member of this body as they have removed themselves [emphasis added].

¶22 We note, first, that this resolution by its own terms constitutes an authoritative ruling on the precise point which Chase raises, and that it was issued, prior to the schism which gave rise to the present litigation, by what all parties agree is the highest decision-making body for the incorporated church. *See Serbian Eastern Orthodox Diocese*, 426 U.S. at 713, 96 S.Ct. at 2382, 49 L.Ed.2d at 165 (civil court must accept the ecclesiastical decisions of church tribunals as it finds them); *Kedroff v. St. Nicholas Cathedral* (1952), 344 U.S. 94,

9

122, 73 S.Ct. 143, 157, 97 L.Ed. 120, 139 (Frankfurter, J., concurring) (authority of courts "in strict subordination to the ecclesiastical law of a particular church prior to a schism") (citation omitted).

¶23 Secondly, we observe that covenant-breaking is, according to this ruling, insufficient of itself to deprive an individual member of his or her seat on the Board. Rather, a finding by the Board to that effect is a necessary precondition for involuntary removal. The corporation apparently selected this method by which to proof its membership roster against irruptions of religious controversy, translating a central mystery of its faith into a practical corporate rule. It was undoubtedly within its rights to do so.

¶24 Under this "purely secular" reading of the resolution, *see Jones*, 443 U.S. at 604, 99 S.Ct. at 3026, 61 L.Ed.2d at 785, the District Court need not inquire into Baha'i religious doctrine concerning what constitutes covenant-breaking, or intrude into the private consciences of the Board members to determine whether any may have fallen into such a state, in order to resolve the membership controversy. Indeed, it must not do so. *See Davis v. Church of Jesus Christ of Latter-Day Saints* (1993), 258 Mont. 286, 852 P.2d 640 (Montana courts cannot involve themselves in issues of church membership if to do so would require them to examine and evaluate the relevant religious beliefs). Instead, upon remand, the District Court's only concerns in this regard will be, first, to determine whether this resolution remained in effect when the church corporate was rent by schism in December 2001, and, if so, to determine whether the Board removed any of its members pursuant thereto. These are ordinary factual inquiries like those in which our district courts routinely engage. The District Court may not, however, inquire into whether the Board afforded "due process," as per the resolution, to such of its members as upon whom it may have "enforced the reality" of covenant-breaking and removal. The Board alone is competent to specify its procedures when it sits in judgment over purely ecclesiastical disputes. *See Serbian Eastern*

*Orthodox Diocese*, 426 U.S. at 712-13, 96 S.Ct. at 2382, 49 L.Ed.2d at 164-65; *Watson v. Jones* (1872), 13 Wall. 679, 20 L.Ed. 666.

¶25    As we noted at ¶ 20, above, Chase also claims that the Guardianship authorized him to act as he did, in regards to both the corporate property and the corporation itself.  He argues that the First Amendment forecloses this inquiry, as well, because it hinges upon whether he is the Guardian, a purely religious issue.

¶26    Though we agree with Chase that no civil court may presume to ascertain the proper successor to a religious office, *see Maktab*, 179 F.3d at 1247-48 (citing *Serbian Eastern Orthodox Diocese*, 426 U.S. at 710-11, 96 S.Ct. at 2381, 49 L.Ed.2d at 163-64), we do not agree that this is the crux of the corporate property issue.  Rather, we focus on the mediating link between the Guardianship and control of the corporate property--namely, the presidency of the corporation.  Chase argues that the Guardianship, a religious office, vests him with the presidency of the corporation, a secular one, and that it is through holding the latter that he rightfully controls the corporate property.  The presidency thus serves in this instance as the temporal nexus between the world of faith, represented by the Guardianship, and the secular world, in which laws define the relationships between persons, corporate or otherwise, and property.  The First Amendment does not preclude the District Court's consultation of corporate bylaws, state statutes, and general corporate and property law to determine the powers of the presidency regarding the corporate property at issue.  *Jones*, 443 U.S. at 602-03, 99 S.Ct. at 3025, 61 L.Ed.2d at 784.

¶27    For example, § 35-2-118, MCA, provides that the board of a corporation controls the corporation's property, in default of a contrary rule set forth in the articles of incorporation.  Section 35-2-118(1)(d), MCA.  Section 4.1 of the Council's Bylaws, moreover, vests all corporate powers in the Board, including the management of the corporation's business and affairs, and Section 5.5 subordinates the president to the Board.

11

¶28    While it is true that the Bylaws refer to various Baha'i religious texts as also governing the affairs of the corporation, this is not in itself fatal.  In *Jones*, for example, the United States Supreme Court approved of the Georgia Supreme Court's having applied neutral principles to The United Methodist Church's *Book of Discipline*, its constitution.  *See Jones*, 443 U.S. at 600, 99 S.Ct. at 3024, 61 L.Ed.2d at 783.  As one might expect from "a book of church law," *The Book of Discipline of the United Methodist Church* (1973) v, the *Discipline* is replete with references to Christian scripture and to the writings of the church fathers.  Nonetheless, the Georgia court's application of neutral principles to the trust provisions set forth in the *Discipline* was cited as an example of the proper application of this approach.

¶29    Regarding the specific relief which the Board has requested, *see* ¶ 7, above, we instruct the District Court as follows.  This dispute revolves around two basic issues:  the composition of the Board, and the powers of the presidency in relation to the church property.  Determining the former on purely secular grounds involves finding whether the Board-membership resolution was in effect at the time of the schism, and, if so, applying it in the manner prescribed.  *See* ¶¶ 23-24, above.  The Board's corporate powers over the property can be defined with reference to the corporate articles, bylaws, and any pertinent resolutions.  They may also be sought in generally religious texts, in the manner and with the limitations set forth in this Opinion.  *See* ¶ 17, above.  The same sources of authority are relevant to the determination of the powers of the corporate presidency, with the same caveats.  The District Court has no power either to anoint a successor to any religious office, or to invalidate any claim thereto.  If these two issues can be resolved on purely secular grounds, then the District Court can apply corporate, property, and tort law in deciding the merits of the Board's conversion and other claims against Chase.

¶30    In dismissing the complaint on Establishment Clause grounds, the District Court, we believe, failed to take the church's Free Exercise Clause rights sufficiently into account.  The

12

United States Constitution does not require the courts to crush the merest flicker of establishment at the cost of the citizen's fundamental right to freely exercise his religion. Tribe §14-8, at 1231. Striking the proper balance is all. While we entertain no illusions as to the difficulty of the task which now faces the District Court, our confidence therein is confirmed by the sensitivity towards constitutional concerns which it has already shown in voluntarily, albeit erroneously, relinquishing jurisdiction over this matter.

¶31    Reversed and remanded for further proceedings consistent with this Opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ PATRICIA O. COTTER
/S/ JIM RICE