No. 04-395

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 302

IN THE MATTER OF THE FAIR HEARING OF:
RITA HOFER, MARY WOLLMAN, ANNA HOFER,
BERTHA HOFER, SARAH HOFER, MARIE HOFER
and JUDITH HOFER,

            Claimants, Petitioners and Cross-Appellants,

    v.

THE MONTANA DEPARTMENT OF PUBLIC HEALTH
AND HUMAN SERVICES,

            Respondent and Appellant.


APPEAL FROM:    District Court of the First Judicial District,
                In and for the County of Lewis and Clark, Cause No. CDV 2003-380
                The Honorable Thomas C. Honzel, Judge presiding.


COUNSEL OF RECORD:

        For Claimants, Petitioners and Cross-Appellants:

        Kent M. Kasting, Kasting (argued), Kauffman & Mersen, Bozeman, Montana; Jeff
        Sveen, Siegel Barnett & Schultz, Aberdeen, South Dakota

        For Respondent and Appellant:

        Christine Killgore Lannan (argued), Russell E. Cater, Special Assistant Attorneys
        General, Department of Public Health and Human Services Office of Legal Affairs,
        Helena, Montana


                                    Argued and Submitted:  March 5, 2005

                                    Decided:  December 6, 2005

Filed:


_____
                        Clerk
Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1	The Department of Public Health and Human Services ("DPHHS") appeals from a Memorandum and Order of the Montana First Judicial District Court, Lewis and Clark County, in which the court held that the net assets of King Colony Ranch, Incorporated, ("KCR" or "Colony")--a Hutterite colony to which the seven above-named Claimants ("Claimants") belong--are not available to Claimants and that a trust relationship does not exist between Claimants and KCR, nor between DPHHS and KCR.  On cross-appeal, Claimants argue that the District Court, in granting Claimants' petition, failed to address an allegedly erroneous conclusion of law made at the administrative level, and ask this Court to affirm the result reached by the District Court but explicitly reverse the administrative agency's conclusion that KCR owes Claimants an enforceable legal duty of support.  We reverse in part and remand for further proceedings.  Because we conclude that the trust relationship analysis is dispositive of the question of whether the Colony's resources are available for the benefit of the Claimants as beneficiaries, we need not address the related question of whether the Colony owes a legal duty of support to its members.

### ISSUES

¶2	The parties present multiple issues on appeal and cross-appeal.  However, we have determined the dispositive issues to be:

¶3	1. Did the District Court err when it concluded that an express trust does not exist between KCR and the members of the King Hutterite Colony ("Colony members")?

¶4	2. Are Claimants entitled to participate in the Family-Related Medicaid Program?

2

**FACTUAL AND PROCEDURAL BACKGROUND**

¶5     Claimants are members of KCR, a Hutterite Colony located near Lewistown. Claimants had been participants in a particular Medicaid program, called the Family-Related Medicaid Program, since about 1991. To be eligible for this program, applicants must meet two "tests"--an "income test," and a "resource test." Under the income test, an applicant cannot have income exceeding $3,000 per year. The parties agree that Claimants have income of less than $3,000 per year and thus the income test is not an issue in this case. Under the resource test, an applicant cannot have resources which are determined to be both "countable" and "available" which exceed $3,000 in value.

¶6     A few years after Claimants began receiving Medicaid benefits, DPHHS scrutinized Claimants' resources and income to determine if Claimants had been correctly deemed eligible for Medicaid. After reviewing KCR's organizational documents, DPHHS concluded that a trust relationship exists between KCR and the Colony members, including Claimants. Additionally, DPHHS determined that one hundred percent of the net worth of KCR--which totals approximately $2.1 million--is available to each individual Colony member. On December 17, 2001, DPHHS notified Claimants that their Medicaid benefits were being terminated because the resources available to each of them exceeded the allowable resource limit of $3,000.

¶7     Claimants requested a Fair Hearing before the Board of Public Assistance ("BPA"). A BPA Hearings Officer presided over a four-day hearing during the summer of 2002. On January 16, 2003, the Hearings Officer, filed a Fair Hearing Decision in which he concluded,

3

based on the Colony's Articles of Incorporation and upon the testimony of the Claimants regarding the care provided to them by the Colony, that a trust relationship existed between KCR and the Colony members with KCR as the Trustee and the members of the Colony as beneficiaries, and that KCR is legally obligated to support the Colony members. The Hearings Officer further concluded that the assets of KCR were available to each individual Colony member on a *pro rata* basis.

¶8     Finally, the Hearings Officer addressed the question of whether the Claimants were entitled to the benefit of any resource exclusions, pursuant to Rule 37.78.401, ARM, when considering what resources should be counted against them for eligibility purposes. The Officer rejected the Department's contention that no exclusions could apply in trust situations, concluding that a reasonable *pro rata* analysis of the countable resources held in the common treasury needed to be conducted so as to determine the Claimants' eligibility for Medicaid. The Hearings Officer accordingly reversed the closure of Medicaid to the Claimants and ordered remand for resource determinations in accordance with its Decision.

¶9     DPHHS and Claimants both appealed portions of the Fair Hearing Decision to the full BPA. On June 3, 2003, the BPA affirmed the Hearings Officer's findings, and some of his legal conclusions. Although the BPA agreed that a trust exists between KCR and the Colony members, it reversed the conclusion that KCR's assets were available to individual Colony members and that each Colony member has access to a *pro rata* share of KCR's assets. It did not reach the issue of whether any of KCR's assets would be excludable pursuant to Rule 37.78.401, ARM.

4

¶10    DPHHS and Claimants both sought judicial review of this decision in the District Court.  DPHHS challenged the BPA's conclusion that KCR's assets were not available to the Colony members and the conclusion that these resources, if available, would be allocated to each Colony member on a *pro rata* basis.  Claimants appealed the conclusion that a trust relationship exists between themselves and KCR, and further challenged the conclusion that KCR owes the Colony members a legal duty of support.

¶11    The District Court did not find the same language in KCR's organizational documents to be pertinent to its decision as did the Hearings Officer and the BPA.  It concluded that KCR's assets were not available to individual Colony members, and furthermore, that a trust relationship between KCR and the Colony members does not exist.  The District Court did not address the BPA's conclusion that KCR has a legal duty to support its members.  From the District Court's Memorandum and Order, filed March 10, 2004, both parties appeal.

## STANDARD OF REVIEW

¶12    Actions brought before the BPA are subject to the requirements of the Montana Administrative Procedure Act ("MAPA").  *Kirchner v. State*, 2005 MT 202, ¶¶ 8-9, 328 Mont. 203, ¶¶ 8-9, 119 P.3d 82, ¶¶ 8-9.  The standard of review of an agency decision under MAPA, set forth at § 2-4-704(2), MCA, provides in pertinent part:

> The court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.  The court may affirm the decision of the agency or remand the case for further proceedings.  The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because:

5

(a)  the administrative findings, inferences, conclusions, or decisions are: . . . (v) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; [or] (vi) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. . . .

¶13   A three-part test is used to determine whether agency findings are clearly erroneous: (1) the record is reviewed to determine if the findings are supported by substantial evidence; (2) if the findings are supported by substantial evidence, it will be determined whether the agency misapprehended the effect of the evidence; and (3) if substantial evidence exists and the effect of the evidence has not been misapprehended, the reviewing court may still decide that a finding is clearly erroneous if a review of the record leaves the court with a definite and firm conviction that a mistake has been made.  *Total Mechanical Heating v. UEF*, 2002 MT 55, ¶ 22, 309 Mont. 84, ¶ 22, 50 P.3d 108, ¶ 22 (citation omitted).

¶14   An agency's conclusions of law are reviewed to determine if they are correct.  *Matter of Kalfell Ranch, Inc.* (1994), 269 Mont. 117, 122, 887 P.2d 241, 245.  The foregoing standard of review is applicable to both the District Court's review of the administrative decision and our subsequent review of the District Court's decision.  *O'Neill v. Department of Revenue*, 2002 MT 130, ¶ 10, 310 Mont. 148, ¶ 10, 49 P.3d 43, ¶ 10 (citations omitted).

## DISCUSSION

### ISSUE ONE

¶15   Did the District Court err when it concluded that an express trust does not exist between KCR and the Colony members?

¶16 DPHHS argues that the District Court erroneously disregarded the findings made at the administrative level and substituted its own findings in their place. DPHHS further argues the District Court erred when it reversed the conclusion of the Hearings Officer, as affirmed by the BPA, that KCR holds its assets in trust for the benefit of the Colony members.

¶17 DPHHS argues that under the provisions of § 72-33-201, MCA, an express trust exists between KCR and the Colony members. Section 72-33-201(1), MCA, states that a trust may be created by a declaration of a property owner that the owner holds the property as trustee. Section 72-33-201(2), MCA, states that a trust may be created by a transfer of property by the owner during the owner's lifetime to another person as trustee. DPHHS claims that in the case before us, while either would suffice, both subsections (1) and (2) have been satisfied. With regard to § 72-33-201(1), MCA, KCR's Articles declare that one of KCR's purposes is to accumulate trust funds and property for its members. Satisfying § 72-33-201(2), MCA, DPHHS argues, KCR's Bylaws declare KCR holds all its property for the sole benefit of its members. In this connection, DPHHS asserts that Colony members have transferred property to KCR and KCR holds that property in trust for the benefit of the Colony members.

¶18 Claimants maintain the District Court correctly concluded as a matter of law that an express trust does not exist between KCR and the Colony members. Claimants dispute that a "transfer of property" which would satisfy the requirements of § 72-33-201(2), MCA, occurred. Relying upon *McCormick v. Brevig*, 1999 MT 86, ¶ 62, 294 Mont. 144, ¶ 62, 980

7

P.2d 603, ¶ 62, Claimants maintain that in order for a trust to be valid, there must have been an *actual* transfer of property, and there is no evidence that property was actually transferred to KCR either at the time of its creation or thereafter.

¶19 DPHHS disagrees. It asserts that KCR's Bylaws declare that KCR holds its assets as a trustee, and these assets came to be owned by KCR because members of the pre-incorporated King Colony Ranch created the corporation and transferred the community's property to it. Indeed, this transfer is undisputed. DPHHS also claims that Colony members make "transfers" to the corporation on an ongoing basis because they work for KCR without receiving wages and the products of that labor become revenue for KCR.

¶20 In the Fair Hearing Decision, the Hearings Officer found that KCR exists as a communal living arrangement where everyone shares his or her productivity and no one individually owns any property. The Hearings Officer further found that all property is held in the name of the corporation and that the financial needs of the Colony members are met out of the community purse. Thus, a trust exists.

¶21 Disagreeing with the findings of the Hearings Officer, the District Court maintained that only a single passage from the Articles bears any relevance to the issue. The District Court explained:

> One of the purposes for which the Colony was incorporated, as stated in its articles of incorporation, is to "support the Church and the members thereof and all of their dependents and to accumulate and create trust funds and property for their dependents and successors. . . ." This is the only language in the Colony's articles of incorporation and by-laws that *could possibly be interpreted as establishing an express trust.* However, the language is not a manifestation of a present intention to create a trust. At most, the language

8

indicates an intention to do something in the future. An intent to create a trust in the future is not sufficient to presently establish a trust. Therefore, the Court concludes that the organizing documents of the corporation do not create an express trust. (Emphasis added.)

We cannot agree with the course taken by the District Court on this issue. In reviewing an agency decision, a court is not free to ignore the findings made at the administrative level. Our standard is not whether there is evidence to support findings *different* from those made by the trier of fact, but whether substantial credible evidence supports the trier's findings. *Taylor v. State Compensation Ins. Fund* (1996), 275 Mont. 432, 440, 913 P.2d 1242, 1246 (citations omitted). As long as substantial credible evidence exists to support the administrative findings, the reviewing court may not overturn them. *Roeber v. State, Dept. of Institutions* (1990), 243 Mont. 437, 440, 795 P.2d 424, 426 (citations omitted).

¶22 The Hearings Officer took account of several provisions of the Bylaws and the Articles to support its finding that a trust exists, which the District Court then erroneously disregarded. In addition to considering the clause from the Articles that the court examined, the Hearings Officer also found pertinent a statement in the Articles that KCR is "devoted exclusively to agricultural pursuits for the livelihood of its members," and that KCR may engage in agricultural enterprises "for the benefit of this corporation and the mutual benefit of all the members." The Hearings Officer further found pertinent passages in the Bylaws, including, "That all the property of the Corporation . . . shall be held in the name of [KCR] for the sole benefit of the Members," and "That no Member . . . shall have vested in them any real or personal property, but the same shall be held forever [as property of KCR]." The

9

BPA upheld these findings. These administrative findings were supported by substantial credible evidence. Thus, the District Court erred by entering findings to the contrary. Section 2-4-704(2), MCA.

¶23 Reinstating the findings as made by the Hearings Officer and affirmed by the BPA, we must next determine whether the District Court erred as a matter of law when it concluded that no express trust exists between KCR and the Colony members. In the Fair Hearing Decision, the Hearings Officer concluded a "trust relationship" exists between KCR and the Colony members. The BPA agreed.

¶24 Claimants contend that no property has ever actually been transferred to KCR from the Colony members and thus no trust may exist. However, though it is undisputed that the pre-incorporated King Colony Ranch transferred the community's property to the KCR corporation, we need not reach this issue. As noted above, an express trust may be created by a declaration of a property owner that the owner holds the property as a trustee. Section 72-33-201(1), MCA. A trustee, as defined by § 72-33-108(7), MCA, means the person holding property in trust. *Black's Law Dictionary* 1519 (7th ed. 1999), defines a trustee as one who, having legal title to property, holds it in trust for the benefit of another and owes a fiduciary duty to that beneficiary.

¶25 We have held that a court may resolve church property disputes by applying neutral, secular principles of property, trust, and corporate law when the instruments upon which those principles operate are at hand. We further held that no First Amendment issue arises when a court resolves a church property dispute by relying on both state statutes concerning

10

the holding of religious property, *and* the terms of corporate charters of religious organizations. *Second Intern. Baha'i Council v. Chase*, 2005 MT 30, ¶ 17, 326 Mont. 41, ¶ 17, 106 P.3d 1168, ¶ 17 (citation omitted) ("*Chase*"). It is undisputed that the organizational documents of KCR are the Articles and Bylaws, and that we may examine them applying neutral principles of law as we did in *Chase*.

¶26 Section VIII of the Bylaws states:

That all the property of the Corporation, both real and personal, shall be held in the name of King Colony Ranch for the sole benefit of the Members of the King Colony Ranch and for their natural heirs and successors. That no Member of the King Colony Ranch shall have vested in them any real or personal property, but the same shall be held foreever [*sic*] and perpetual as the Cooperative properties of the King Colony Ranch in accordance with the ordinances of the Cooperative Hutterische Church Society and its Rituals and belief in the humility of man before his Maker and God.

¶27 Furthermore, the Constitution of the Hutterian Brethren Church and Rules As To Community of Property ("Hutterian Constitution"), which was admitted into evidence during the Fair Hearing, states:

36. No individual member of a Colony shall have any assignable or transferable interest in any of its property, real or personal.

37. All property, real and personal, of a Colony, from whomsoever, whensoever, and howsoever it may have been obtained, shall forever be owned, used, occupied, controlled and possessed by the Colony for the common use, interest, and benefit of each and all of the members thereof, for the purposes of such Colony.

¶28 The language found within the organizing documents of KCR is internally consistent and unambiguous. The intention of the Colony and the understanding of its members is that KCR's assets are held in trust for the benefit of the members and their heirs. Language in

11

the Articles, Bylaws, and Hutterian Constitution all support this conclusion. Although Claimants argue that there is insufficient evidence to support such a conclusion, they have given us no evidence which contradicts the language of KCR's organizing documents or the Hutterian Constitution. Claimants furthermore do not dispute that this language is indeed followed in the practices of the Colony and its members. The party who asserts the existence of a trust has the burden of proving its existence and contents by clear, unmistakable, satisfactory and convincing evidence. *McCormick*, ¶ 56. DPHHS has met this burden, and Claimants have raised no serious challenges to the accuracy of the evidence upon which DPHHS relies. Thus, we conclude that the Hearings Officer's conclusion that an express trust exists was correct.

¶29 The Colony as trustee has the duty to administer the Trust in the interest of its members as beneficiaries. Section 72-34-103(1), MCA; *In re Estate of Bradshaw*, 2001 MT 92, ¶ 39, 305 Mont. 178, ¶ 39, 24 P.3d 211, ¶ 39. Based upon the language of the internal documents noted above, as well as the testimony of the Claimants and other Colony witnesses, we conclude that the trust's resources are available for the benefit of its members, including the Claimants.

**ISSUE TWO**

¶30 Are Claimants entitled to participate in the Family-Related Medicaid Program?

¶31 In structuring the Medicaid program, Congress chose to direct the limited funds available to the most impoverished people. *Ramey v. Reinertson* (10th Cir. 2001), 268 F.3d 955, 958 (citation omitted). Eligibility for Medicaid is dependent upon a determination of

12

whether an applicant has "available" resources, and coverage will be denied if an applicant's resources exceed a statutory ceiling. *Ramey*, 268 F.3d at 958; 42 U.S.C. § 1396a(a)(10)(A)(i)(IV). Because some applicants attempted to shelter their assets by placing those assets into irrevocable trusts, the United States Congress passed legislation which restricts the ability of applicants to use trusts to shelter assets and gain Medicaid eligibility. *Ramey*, 268 F.3d at 958. *See* 42 U.S.C. § 1396a(k), now replaced by 42 U.S.C. § 1396p(d).

¶32    Within the federal Medicaid program, each participating state develops a plan containing reasonable standards for determining eligibility for medical assistance, and an individual becomes eligible for Medicaid if he or she meets the state's criteria. *Schweiker v. Gray Panthers* (1981), 453 U.S. 34, 36-37, 101 S.Ct. 2633, 2636, 69 L.Ed.2d 460, 465; 42 U.S.C. § 1396a.

¶33    In its brief to this Court, DPHHS argues that per its regulations, Claimants are not entitled to participate in this particular Medicaid program. An individual is ineligible for this Medicaid program if DPHHS can ascribe to that individual $3,000 or more of "countable, available resources." It is undisputed that KCR has assets totaling approximately $2.1 million net. However, whether this ascribes $3,000 or more to each of the Claimants in this case so as to render them ineligible for Medicaid rests upon two determinations: how much, if any, of that $2.1 million is a "countable" (as opposed to "excludable") asset; and whether KCR's countable assets are "available" to each Claimant at all, and if so, whether that

13

availability should be *in toto*, *pro rata*, or in some other proportion. Unfortunately, neither of these determinations has yet been made.

¶34 The administrative and judicial review process has resulted in a mixed bag of unreconcilable findings. Because the District Court concluded that no trust exists, it did not reach the issue of whether Claimants would be eligible for Medicaid. Although the BPA concluded that a trust exists between KCR and Claimants, it reversed the Hearings Officer's conclusion that KCR's assets are available to Claimants, noting that a Colony member's right to be supported does not give the Colony member a property interest in KCR's assets. The BPA relied upon language in the Articles which state that no Colony member may hold any special property rights in KCR's property; language in the Bylaws which states that no Colony member shall have vested in them any real or personal property; a superceded DPHHS Memorandum; and the Federal Program Operations Manual System ("POMS"), which the Social Security Administration uses to process claims for Social Security benefits, and which the BPA concedes does not apply to Medicaid. Because the BPA concluded that none of KCR's assets were available to Claimants, it did not consider whether any of KCR's assets would be countable or excludable under the applicable regulations.

¶35 In the Fair Hearing Decision, the Hearings Officer concluded that Rule 37.78.401, ARM, specifically allows numerous exclusions from the resource accounting which DPHHS undertakes in determining the amount of resources available to a claimant, and that in the situation at hand, DPHHS failed to undertake this analysis and instead argued without citable authority that assets held in trust are automatically considered "countable" resources for the

14

purposes of DPHHS' resource determinations. The Hearings Officer concluded that a trust relationship does not preclude this analysis. *See* ¶ 8 herein. The Hearings Officer further concluded that because KCR's income is divided into equal shares for tax purposes, it would stand to reason that the resources would likewise be divided and allocated on a *pro rata* basis.

¶36     Pursuant to § 53-6-113(1), MCA, DPHHS shall adopt appropriate rules necessary for the administration of the Montana Medicaid program that may be required by federal laws and regulations governing state participation in Medicaid. Pursuant to § 53-6-113(6), MCA, those rules may include, among other criteria, financial standards and criteria for income and resources and treatment of resources. DPHHS argues that under the administrative rules it has crafted, it must consider as "available" to an applicant the maximum amount distributable from a trust of which that applicant is a beneficiary. The pertinent language in the Medicaid Manual states, "If the trust is considered to be accessible, the value of all the resources held by the trust must be counted in determining the household's/individual's resource eligibility." *See Centers for Medicare and Medicaid Services, Federal Medicaid Agency, State Medicaid Manual, § 3215.3*. In Claimants' case, DPHHS argues, that amount is the full value of the trust because the trust's organizing documents contain no limiting language.

¶37     A single sentence from DPHHS' own manual is scant authority upon which to base an ultimate conclusion on an issue of such importance, and yet it is the only authority DPHHS offers. DPHHS argues that KCR could in its discretion spend the full amount of the trust's assets to pay for the medical care of a single Colony member. While DPHHS

15

concedes that this approach may seem unsatisfactory, DPHHS maintains it is the approach mandated by the State's application of the Federal government's Medicaid regulations. DPHHS asserts that it requires families who apply for Medicaid to spend all their assets until the family's countable resources total $3,000 or less; families cannot allocate resources separately for each family member. This is so, DPHHS maintains, even if the result is that a family is forced into bankruptcy, because the Medicaid rules simply do not permit a family to divide resources by the number of members. While pursuant to § 53-6-131(2), MCA, DPHHS may indeed establish income and resource limitations within the amounts permitted by federal law, here, we do not have members of a nuclear family. Rather, we are presented with multiple families within a community. DPHHS has failed to demonstrate that treating an entire community as if it were a nuclear family is consistent with the applicable federal provisions.

¶38    Throughout this litigation, DPHHS has staked its position almost entirely upon its interpretation of its own regulations. DPHHS administers the Montana Medicaid program and is statutorily required to follow the federal government's mandates for administration of the state Medicaid program. Section 53-6-101(1), MCA. DPHHS does not provide us with any external authority to support its assertions that trust resources are automatically deemed countable resources, and that KCR's assets are available *in toto* to each Colony member. We are simply unprepared to hold that these Claimants are ineligible for Medicaid based upon DPHHS' assertions that it has correctly applied its regulations, and little else.

16

¶39    We are likewise reluctant to follow the BPA's approach in declaring KCR's assets unavailable based upon an outdated memorandum which is disclaimed by the administrative agency which authored it, and a federal manual which does not apply to the Medicaid program. However, we do not fault the courts at the administrative or district court levels for failing to provide us with the findings we require. The Medicaid program is complex, detailed, and in a constant state of evolution. The preliminary issues of legal duty and the existence of a trust--as well as other issues which we conclude are not relevant to the outcome of this case--have overshadowed the determinative issue. While all parties in this case have spent significant time and energy arguing details of peripheral importance, the central issue of *whether Claimants are eligible for Medicaid* remains unresolved. Based upon the record before us, we are unable to make a determination on this Issue and remand to the District Court for remand to the Hearings Officer for further fact-finding and consideration of the applicable law.

¶40    Before concluding, we turn briefly to the Dissent. The dissenting justice posits-- without supporting secular authority--that "separation (of government from religion) must take precedence over the application of neutral criteria," and that "separation trumps neutrality if neutrality leads to a governmental interpretation of religious doctrine." Dissent, ¶ 67. We respectfully disagree with this proposition.

¶41    As the Dissent notes in ¶ 66, the United States Supreme Court recently held that a government-funded voucher system which provided students with tuition aid to attend the school of their choice, whether public or private, was not constitutionally infirm because the

17

program benefitted "a wide spectrum of individuals, defined only by financial need and residence in a particular school district." *Zelman v. Simmons-Harris* (2002), 536 U.S. 639, 662, 122 S.Ct. 2460, 2473, 153 L.Ed.2d. 604, 623. Similarly, Medicaid benefits a wide spectrum of individuals, who qualify for its benefits based upon financial need and their residence in the state. The Medicaid program does not discriminate in favor of or against claimants or anyone else on the basis of their religious beliefs. Rather, the program quite properly--and neutrally--requires all who seek its benefits to meet the same income and resource tests. In the words of the Dissent, when the Department does this, it is acting "neutrally in the face of a citizen's exercise of his or her religion." Dissent, ¶ 66. This is as it should be.

¶42 The Dissent also maintains that while the Department was entitled to examine Claimants' resources in the same manner as it would any other applicant's, neither it nor any civil court can reach conclusions therefrom because the organizational documents of Claimants' faith contain no severable secular language capable of discreet analysis. Again, we disagree. While certainly some of the language of the Articles and By-laws is religious in tone, much of the language is secular, incorporating bedrock legal terms and principles that have always been amenable to legal analysis. *See, e.g.*, ¶ 26. The fact that legal concepts are incorporated into a document which also sets forth articles of faith should not completely shield the document from legal scrutiny. With all due respect, and without reference to these Claimants and this case, under the Dissent's logic, any sect--or cult--could, with the aid of a clever draftsman, qualify its members for benefits while insulating them

18

from any requirement for qualification. Given the dearth of Medicaid dollars and the multitude of deserving applicants competing for those dollars, we simply conclude that all who seek the same benefits should be subject to the same qualification analysis, irrespective of their faith or lack of it. This is the essence of neutrality, and its principles are properly applied here. Though the Dissent faults us for not elevating separation over neutrality, we conclude we have properly--and evenly--applied both principles. As noted in *Everson*, it is the State's obligation to extend government benefits to *all* citizens without regard to their religious beliefs. *Everson v. Board of Education* (1947), 330 U.S. 1, 16, 67 S.Ct. 504, 512, 91 L.Ed 711, 724. Separation does not demand that we elevate a group of persons to privileged status, above all other applicants, *because* of their religious beliefs.

## CONCLUSION

¶43    For the above-stated reasons, we conclude that an express trust exists between the Colony and its Members, and that its resources are available for the benefit of its beneficiaries, including Claimants. We remand this matter to the District Court for remand to the Hearings Officer for a determination of whether Claimants are eligible for the Family-Related Medicaid Program. In this connection, the Hearings Officer shall make a factual and legal determination of whether Claimants satisfy the "resource test" (see ¶¶ 5 and 33 herein), to include a determination of what Colony resources are "countable," (as opposed to "excludable"), and the extent to which the countable resources are available to each individual Claimant.

¶44    Reversed and remanded.

19

/S/ PATRICIA O. COTTER

We Concur:

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON

/S/ JOHN WARNER

/S/ W. WILLIAM LEAPHART

District Court Judge Loren Tucker concurs and dissents.

¶45    I concur in the result reached by the Court and respectfully dissent regarding one point.

¶46    I respectfully dissent from the Court's determination that conclusions drawn by the Hearings Officer are findings.  I agree that the Hearings Officer properly analyzed the documents described in ¶ 22.  I respectfully suggest that the Hearings Officer drew conclusions from analysis of these documents rather than having made findings of fact.  Therefore, I believe the standard of review is different from that described in ¶ 22.  On this point I generally agree with the analysis in ¶ 52 of the Dissent which distinguishes between facts and conclusions.

/S/ LOREN TUCKER
District Court Judge Loren Tucker
sitting for Justice Brian Morris

Justice Jim Rice dissenting.

¶47 The Court violates the Establishment Clause and the Free Exercise Clause of the United States Constitution and of Article II, Section 5 of the Montana Constitution by deciding matters which are governed by religious tenet. I dissent.

¶48 The crux of this case is the nature of the Colony's obligation to its members–whether KCR holds property in trust to meet the individual needs of the members–and whether such a determination can be made without invoking religious doctrine. Relying on an incomplete reference to *Chase* and several isolated snippets from the Colony's organizational documents, the Court proclaims in ¶ 28 that the "intention of the Colony and the understanding of its members is that KCR's assets are held in trust for the benefit of the members and their heirs" and that "an express trust exists" between KCR and its members. In doing so, the Court misapprehends the evidence and the applicable law, and sets a troubling precedent for church-state relations. With a few sentences, the Court sweeps away both the religious principles at work in the Colony's documents and the Claimants' religious rights.

¶49 Below I explain how the Court misapplies *Chase*, and further, that the Court fails to recognize other Religion Clause principles at issue here. *Chase* and the United States Supreme Court decision on which it relies, *Jones v. Wolf*, represent but one part of the First Amendment's Religion Clause analysis. The Court ignores the remainder of the analysis, but, clearly, violates *Chase* by its decision. A complete analysis demonstrates that the Court can perform no inquiry under the facts here which would allow the conclusion that a trust

exists between KCR and the Claimants to meet their individual needs. The duty which flows from KCR to support the Claimants is a religious, not a legal, one. To conclude otherwise requires a religious inquiry which violates the Claimants' religious freedom as protected under the Establishment Clause and Free Exercise Clause of the United States Constitution and of Article II, Section 5 of the Montana Constitution.[1]

¶50    The jurisprudence of the Religion Clauses is complex, and this dissent is not the place to discuss its myriad nuances. It is sufficient for the purposes of this case to summarize the Religion Clause precedent and to demonstrate how the State's actions here are inappropriate. Because the law in this area has developed almost exclusively under the federal constitution, this dissent necessarily focuses thereon. Further, the Claimants' arguments are primarily based on federal law.

¶51    Before turning to the law of the Religion Clauses, however, I pause to explain why such an exploration is necessary. In ¶¶ 21-22, the Court confounds the applicable standards of review. As the Court initially notes correctly in ¶¶ 12-14 of its opinion, the District Court, in reviewing the Hearings Officer's and the BPA's decisions, was required to apply a "clearly erroneous" standard to its review of factual findings. *See O'Neill v. Dep't of Revenue*, 2002 MT 130, ¶ 10, 310 Mont. 148, ¶ 10, 49 P.3d 43, ¶ 10. The District Court was

---

[1]The cases and literature employ inconsistent terminology when referring to the Establishment Clause and the Free Exercise Clause, sometimes using "Establishment Clause" as an umbrella term to refer to both. For the sake of clarity, unless in a quotation, my references to each clause are exclusive to that clause. When referring to both clauses jointly, I will use the term "Religion Clauses."

also required to review the agency's conclusions of law for correctness. *See ¶¶* 12-14; § 2-4-704(2)(a)(iv), MCA; *O'Neill, ¶* 10. Similarly, this Court reviews findings of fact for clear error and conclusions of law for correctness. *See ¶¶* 12-14; *O'Neill, ¶* 10.

¶52 However, the majority incorrectly intimates in ¶ 21 that the District Court ignored the findings of fact made at the administrative level, and it incorrectly holds in ¶ 22 that "the District Court erred by entering findings" contrary to the Hearings Officer and the BPA. To the contrary, the District Court did not "ignore" the findings of fact from the decisions below; rather, it disagreed with the conclusions of law. Likewise, the District Court did not enter its own findings of fact at odds with the agency orders, but instead entered its own conclusions of law. There is no indication in the District Court's order that it disagreed with the factual findings; for example, that KCR is devoted to agricultural pursuits, that the agricultural enterprises are for the benefit of the Colony, or that the Colony's documents contain the information that they do. Instead, the District Court drew a different conclusion of law from this evidence–namely, that no express trust existed. Implicit in the District Court's conclusion of law was that it did not consider some of the factual findings as pertinent or determinative to the ultimate legal conclusions as the Hearings Officer and the BPA did in arriving at their contrary conclusions of law. That does not mean, however, that the District Court ignored the agency's findings of fact, or that it found them to be clearly erroneous, or that it found that the evidence supported different findings of fact. The majority's holding thus misconstrues the District Court's ruling and clouds the issues this Court is to decide.

24

¶53    The task which has been placed before us is to determine if the District Court's order and the administrative orders contain correct conclusions of law.  Because the unique facts of this case involve distribution of government benefits to members of a religious organization, it is necessary to examine the impact of the constitutional Religion Clauses before the correctness of the conclusions of law can be properly determined.  I now turn to that examination.

## I.  The *Jones-Chase* Rule

¶54    The controversy in *Chase* centered over a schism within a Baha'i congregation resulting in different parties claiming the right to control church property.  The Court in *Chase* relied heavily on the United States Supreme Court's "neutral principles" analysis developed in *Jones v. Wolf* (1979), 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775, which involved a Presbyterian congregation's schism and subsequent struggle for control over church property.  The neutral principles approach is one of at least three (the other two being deference to the church's hierarchical authority and application of relevant state statutes) that the United States Supreme Court has stated are appropriate for resolving church property disputes.  *Jones*, 443 U.S. at 602, 99 S.Ct. at 3025, 61 L.Ed.2d at 784 (citing *Maryland & Va. Churches v. Sharpsburg, Inc.* (1970), 396 U.S. 367, 368, 90 S.Ct. 499, 500, 24 L.Ed.2d 582, 584  (Brennan, J., concurring)).  The *Jones* Court described this approach:

> *Through appropriate reversionary clauses and trust provisions*, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy.  In this manner, a religious

> organization can ensure that a dispute over the ownership of church property will be resolved in accord with the desires of the members.

*Jones*, 443 U.S. at 603-04, 99 S.Ct. at 3025-26, 61 L.Ed.2d at 785 (emphasis added). The *Jones* Court went on to hold "that a State is constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute." *Jones*, 443 U.S. at 604, 99 S.Ct. at 3026, 61 L.Ed.2d at 785.

¶55 *Chase* added to *Jones* by maintaining that states, religious organizations, and individuals are responsible for structuring relationships "'involving church property so as not to require the civil courts to resolve ecclesiastical questions,'" *Chase*, ¶ 15 (quoting *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church* (1969), 393 U.S. 440, 449, 89 S.Ct. 601, 606, 21 L.Ed.2d 658, 665), and that "[i]f they have not so laid the groundwork for *purely secular resolution* of such a dispute, the civil court confronted with it cannot but decline jurisdiction." *Chase*, ¶ 15 (emphasis added).

¶56 Both the facts of and the analysis employed in *Chase* and *Jones* illustrate that those holdings apply to the resolution of *intra-church* property disputes, not simply to any kind of dispute involving church property. In the present case, there is no controversy within KCR about control of its property. Indeed, KCR is not a party to the dispute. Therefore, while the "purely secular resolution" rule of *Jones-Chase* is a helpful principle, this precedent alone is not controlling because it has not previously been applied to a benefit case like the one before us, as the Court would have it do. Thus, the Court's reliance on *Chase* to reach

26

its conclusion that KCR holds its property in an express trust to meet the individual needs of its members is incomplete and, as demonstrated herein, inappropriate.

¶57 Moreover, the majority incorrectly states in ¶ 25 that "[i]t is undisputed that the organizational documents of KCR are the Articles and Bylaws, and that we may examine them applying neutral principles of law as we did in *Chase*." As the Claimants correctly state in their brief, "[J]udicial involvement [in apparent religious matters] is warranted only when a case can be decided solely upon the application of Neutral Principles of Contract Law *without reference to any religious principle*" (italics added). As discussed in Parts IV and V below, neutral principles of law can only be applied to the organizational documents if relevant secular language in them can be severed from references to religious principle or belief.

## II. The *Sherbert* Test

¶58 Beginning with *Sherbert v. Verner* (1963), 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965, the United States Supreme Court has held that the denial of unemployment benefits to applicants who refuse to compromise their religious principles in order to obtain work imposes an impermissible burden on religion. *Thomas v. Review Bd. of the Ind. Employment Sec. Div.* (1981), 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (Jehovah's Witness fired because he would not participate in the production of armaments was entitled to unemployment benefits); *Hobbie v. Unemployment Appeals Comm'n* (1987), 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (Seventh-day Adventist fired for refusing to work shifts scheduled on the Sabbath was entitled to unemployment benefits); *Frazee v. Illinois Dep't*

27

*of Employment Sec.* (1989), 489 U.S. 829, 109 S.Ct. 1514, 103 L.Ed.2d 914 (Christian turning down job that would require him to work on Sundays in contravention of religious belief was entitled to unemployment benefits). In all of these cases, "the employee was forced to choose between fidelity to religious belief and continued employment; the forfeiture of unemployment benefits for choosing the former over the latter [brought] unlawful coercion to bear on the employee's choice." *Hobbie*, 480 U.S. at 144, 107 S.Ct. at 1051, 94 L.Ed.2d at 200. The *Sherbert* Court elaborated that "[g]overnmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed" on a worshiper. *Sherbert*, 374 U.S. at 404, 83 S.Ct. at 1794, 10 L.Ed.2d at 970-71. Mindful of this burden on religion, the Court considered whether "some compelling state interest" nonetheless justified "the substantial infringement" of the applicant's First Amendment right, *Sherbert*, 374 U.S. at 406, 83 S.Ct. at 1795, 10 L.Ed.2d at 972, and concluded that there was no such compelling interest. *Sherbert*, 374 U.S. at 409, 83 S.Ct. at 1796, 10 L.Ed.2d at 973.

¶59    The Supreme Court has expressed reluctance about applying the *Sherbert* test outside of the context of unemployment benefits, *see Employment Div., Dep't of Human Res. v. Smith* (1990), 494 U.S. 872, 883, 110 S.Ct. 1595, 1602, 108 L.Ed.2d 876, 888,[2] but the test

---

[2]Despite its expressed reluctance, the Supreme Court in fact has applied the *Sherbert* test outside the unemployment benefits context. *See Gillette v. United States* (1971), 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (incidental burdens felt by humanist and Catholic with religious objections to the Vietnam war, but not all wars, are justified by the substantial governmental interests in procuring the manpower necessary for military purposes); and *United States v. Lee* (1982), 455 U.S. 252, 102 S.Ct. 1051, 71

28

has been nonetheless been applied elsewhere. The Eighth Circuit Court of Appeals applied *Sherbert* to Medicaid and Medicare benefits in *Children's Healthcare Is A Legal Duty, Inc. v. Min De Parle* (8th Cir. 2000), 212 F.3d 1084, 1093, noting that "[t]he Supreme Court in *Sherbert v. Verner* held that legislation which forces an individual to choose between following his religious beliefs and receiving government benefits places a burden on that person's religious exercise." The Court considered whether statutory accommodations for benefit recipients with particular religious views concerning medical care violated the Religion Clauses and, in so doing, reasoned as follows about the relationship between religious conviction and benefit eligibility:

> [T]he Medicare and Medicaid Acts place individuals who hold religious objections to medical care in a situation similar to that contemplated by the Sherbert line of cases. *They are forced to choose between adhering to their religious beliefs and foregoing all government health care benefits, or violating their religious convictions and receiving the medical care provided by Medicare and Medicaid.* The pressure to violate religious convictions is especially acute under Medicaid, which often represents the only source of health care for indigent persons. By extending nonmedical health care benefits to individuals who object for reasons of religion to medical treatment, section 4454 [the accommodation provision] *spares such individuals from being forced to choose between adhering to the tenets of their faith and receiving government aid, and in doing so removes a burden that the law would otherwise impose.*

*Children's Healthcare*, 212 F.3d at 1093 (emphasis added). On such reasoning, the Court of Appeals held constitutional the federal statute that created exceptions to the Medicare and Medicaid Acts for persons who have religious objections to the receipt of medical care,

---

L.Ed.2d 127 (government's interest in assuring participation in and contribution to the social security system requires Old Order Amish employer to pay social security taxes despite religious objection).

enabling such individuals to obtain government assistance for nonmedical care. Comparing these benefits with the unemployment benefits at issue in *Sherbert*, the Court of Appeals reasoned that "[a]lthough unemployment benefits may be broader in scope than health care benefits, both are widely available public benefits that are of great importance to personal well-being." *Children's Healthcare*, 212 F.3d at 1094. The Court of Appeals then concluded that, just as the burden on the unemployment benefits applicant in *Sherbert* required religious accommodation, so too was the burden on applicants in the healthcare context sufficient to permit the congressional accommodation. *Children's Healthcare*, 212 F.3d at 1094.

¶60 Although *Children's Healthcare* addressed the "flip side" of the Religion Clause benefit issue, that is, a governmental accommodation of religious belief instead of a governmental impingement of religious belief, it nonetheless addressed the core constitutional concern of *Sherbert* and of this case–avoiding the imposition of a burden upon the free exercise of religion–and provides important instruction for this matter. Under the *Sherbert* cases, the federal courts will not permit a state to force a citizen to choose between the exercise of his or her religious faith and the receipt of government benefits without a compelling state interest. The Claimants in the instant case, like Sherbert and the parties in the subsequent line of cases, were denied government benefits. Also as in the *Sherbert* cases, the benefits were denied to the Claimants here because of their religious practice of granting all property to the Colony and owning nothing. As found by the Hearings

Examiner, this practice is based upon religious tenet and is the centerpiece of the Claimants'

religious life:

> The Colony exists in the form of a communal living arrangement where everybody shares his or her productivity and nobody individually owns real or personal property.
>
>     . . . .
>
> The community of goods principle is derived from the Bible, Acts 2:44-47 and 4:32-35, which reads, "And all that believed were together, and had all things in common; and sold their possessions and goods, and parted them to all men, as every man had need. . . . [Ellipsis in original.] And the multitude of them that . . . believed were of one heart and of one soul, neither said any of them that ought of the things which he possessed were his own; but they had all things in common."

¶61 This religious practice of divestiture, according to DPHHS, has disqualified the

Claimants from benefit eligibility because the Claimants must be considered, contrary to

their religious beliefs, to have retained a personal beneficial interest in the property owned

by the Colony. The Court approves this position, concluding that the members have a

beneficial interest in Colony property, which the Colony holds in trust to meet the individual

needs of the members.

**III. Separation and Neutrality**

¶62 The tension, or "incompatibility," as we called it in *Chase*, ¶ 14, between the non-

establishment and the free exercise mandates of the First Amendment's Religion Clauses are

best illustrated by the United States Supreme Court's "separation" and "neutrality" holdings.

The general framework of this analysis can be understood from four landmark decisions:

*Everson v. Board of Educ. of Ewing* (1947), 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711; *Engel*

*v. Vitale* (1962), 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601; *School Dist. v. Schempp* (1963), 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844; and *Zelman v. Simmons-Harris* (2002), 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604. *Everson* is the first modern Religion Clause case. There, the Court considered the constitutionality of a New Jersey statute that paid bus fares for children traveling to and from school, regardless of whether those schools were government-run or parochial. In upholding the statute, the Court stated the following:

> New Jersey cannot consistently with the "establishment of religion" clause of the First Amendment contribute tax-raised funds to the support of an institution which teaches the tenets and faith of any church. On the other hand, other language of the amendment commands that New Jersey cannot hamper its citizens in the free exercise of their own religion. Consequently, it cannot exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, *because of their faith, or lack of it*, from receiving the benefits of public welfare legislation. While we do not mean to intimate that a state could not provide transportation only to children attending public schools, we must be careful, in protecting the citizens of New Jersey against state-established churches, to be sure that we do not inadvertently prohibit New Jersey from extending its general State law benefits to all its citizens without regard to their religious belief.

*Everson*, 330 U.S. at 16, 67 S.Ct. at 512, 91 L.Ed. at 724. This passage from *Everson* sowed the seeds of what would become two prominent tracks of Religion Clause inquiry, separation and neutrality.

## A. Separation

¶63 The primary purpose of the Establishment Clause is to separate government from religion. Separation "seeks to ensure that government and religion each operate freely in their own separate spheres, uninhibited by regulation or control by the other." Frederick

Gedicks, *A Two-Track Theory of the Establishment Clause*, 43 Boston College Law Rev. 1071, 1072 (2002). The concept of separation is perhaps best illustrated by the school prayer cases, *Engel v. Vitale* (1962), 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601, and *School Dist. v. Schempp* (1963), 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844. In *Engel*, the United States Supreme Court struck down New York's state-approved prayer which was required to be recited daily in public schools. The Court stated that "[t]he Establishment Clause . . . stands as an expression of principle on the part of the Founders of our Constitution that religion is too personal, too sacred, too holy, to permit its 'unhallowed perversion' by a civil magistrate." *Engel*, 370 U.S. at 431-32, 82 S.Ct. at 1267, 8 L.Ed.2d at 608. The next year, the Court in *Schempp* invalidated actions by Pennsylvania and the City of Baltimore, Maryland, which required the public schools to begin each day with a Bible reading, holding:

> The place of religion in our society is an exalted one, achieved through a long tradition of reliance on the home, the church and the inviolable citadel of the individual heart and mind. We have come to recognize through bitter experience that it is not within the power of government to invade that citadel, whether its purpose or effect be to aid or oppose, to advance or retard.

*Schempp*, 374 U.S. at 226, 83 S.Ct. at 1573-74, 10 L.Ed.2d at 860-61.

¶64 Thus, religious belief and doctrine are subjects with which the government may not engage, whether to advance or diminish.

### B. Neutrality

¶65 In contrast, the primary purpose of the Free Exercise Clause is to ensure government neutrality regarding the religious choices and practices of its citizens, or lack thereof. Indeed, "[n]eutrality requires that government regulate its interactions with religious

individuals and institutions so that it neither encourages nor discourages religious beliefs or practices." Gedicks, 43 B.C. L. Rev. at 1072. Further, "the guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse." *Rosenberger v. Rector & Visitors of Univ. of Va.* (1995), 515 U.S. 819, 839, 115 S.Ct. 2510, 2521, 132 L.Ed.2d 700, 722. The neutrality analysis has typically been applied in cases of religious groups or individuals seeking benefits equal to those afforded other groups within a school or school system. *See, e.g.*, *Good News Club v. Milford Cent. Sch.* (2001), 533 U.S. 98, 121 S.Ct. 2093, 150 L.Ed.2d 151; *Rosenberger*, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700; *Board of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet* (1994), 512 U.S. 687, 114 S.Ct. 2481, 129 L.Ed.2d 546; *Widmar v. Vincent* (1981), 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440; *Everson,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711.

¶66    The distinction between separation and neutrality was highlighted in the recent case of *Zelman v. Simmons-Harris* (2002), 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604. In *Zelman*, the Court considered the constitutionality of Cleveland's government-funded voucher system, which provided students with tuition aid to attend the school of their choice, public or private. The Court acknowledged that the Establishment Clause "prevents a State from enacting laws that have the 'purpose' or 'effect' of advancing or inhibiting religion," *Zelman*, 536 U.S. at 648-49, 122 S.Ct. at 2465, 153 L.Ed.2d at 614, but, despite the fact that a majority of the voucher participants selected sectarian schools, the Court concluded that

the program was "entirely neutral with respect to religion" because it provided "benefits directly to a wide spectrum of individuals, defined only by financial need and residence in a particular school district" and it permitted "such individuals to exercise genuine choice among options public and private, secular and religious." *Zelman*, 536 U.S. at 662, 122 S.Ct. at 2473, 153 L.Ed.2d at 623. Thus, neutrality seeks not to segregate government and religion so much as it enables–and requires–the government to act neutrally in the face of a citizen's exercise of his or her religion.

## C. Clash of Separation and Neutrality

¶67    We are left with competing mandates under the Religion Clauses. On the one hand, neutrality requires that states use neutral criteria in determining eligibility for government benefits that pay no regard to the applicants' religious beliefs. On the other hand, the separation principle requires that, if the application of neutral criteria leads to a question of religious doctrine, then the state is prevented from interpreting that religious doctrine. The United States Supreme Court has stated that "there is room for play in the joints between the Free Exercise and Establishment Clauses," *Cutter v. Wilkinson* (2005), _ U.S. _, 125 S.Ct. 2113, 2117, 161 L.Ed.2d 1020, 1029 (quotation marks omitted), but it has made clear that the "Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from making adherence to a religion relevant in any way to a person's standing in the political community." *County of Allegheny v. American Civil Liberties Union* (1989), 492 U.S. 573, 594, 109 S.Ct. 3086, 3101, 106 L.Ed.2d 472, 495 (internal quotation marks omitted). Thus, in this case, if the government's

examination of resources available to the Claimants requires delving into the religious beliefs of the Claimants or the tenets of their religion–thereby taking a position on questions of religious belief or making adherence to a religion relevant to the Claimants' standing in the political community–separation must take precedence over the application of neutral criteria. In short, separation trumps neutrality if neutrality leads to a governmental interpretation of religious doctrine.

¶68    The Court, in ¶¶ 40 and 41, disagrees with this proposition, stating that the Department's application of neutral criteria in the face of a citizen's exercise of his or her religion "is as it should be." *See* ¶ 41. However, the law does not permit the inquiry to stop there. Neutral criteria is not the universal solution to all Religion Clause issues:

> Establishment Clause doctrine provides a minimum level of church-state separation against even religiously neutral government actions. In other words, not only has the separation of church and state not been eclipsed by religious neutrality, but *separation is actually the more fundamental Establishment Clause value. As such, separation remains a necessary check on interactions between religion and government that pass muster under neutrality analysis*.

Gedicks, 43 B.C. L. Rev. at 1076 (emphasis added). Thus, the neutrality principle alone, though it may have resolved the issue before the United States Supreme Court in *Zelman*, as the Court notes, cannot alone resolve the very different issue here.

¶69    DPHHS was thus entitled to examine the Claimants' resources in the same manner as it would those of any other applicant. Because that includes looking to resources available to the applicants under a trust, DPHHS was correct to inquire whether a trust existed, whether KCR was the trustee, and what provisions governed the trust. DPHHS explains that,

36

in doing so, it evaluated King Colony Articles of Incorporation, the King Colony By-Laws, the Constitution of the Hutterian Brethren Church and Rules as to Community of Property, statements of Hutterite leaders, and federal and state statutes. However, DPHHS also explains that it evaluated "the teachings and tenets of the Hutterite Church as set forth in various religious and scholarly writings . . . ." The Religion Clauses require that we carefully scrutinize this action.

## IV. The Religion Clauses: A Multi-faceted Inquiry

¶70    From these analyses, we can discern a proper application of the Religion Clauses. First, the *Jones-Chase* rule, a product of the separation principle, forbids civil courts from interpreting church doctrine or teachings to resolve intra-church property disputes. *Chase* requires that courts examine church documents to determine whether "purely secular" language can be found to resolve those disputes. *Chase*, ¶ 15. In doing so, *Chase* admonishes that courts must "exercise great care to avoid resolving such disputes on the basis of religious doctrine and practice." *Chase*, ¶ 13. This precedent strongly suggests that a careful review of the Colony's documents is necessary to resolve the matters herein. That is undertaken below.

¶71    Second, the *Sherbert* cases demonstrate that the government cannot force an individual to choose between receipt of government benefits and religious convictions absent a compelling state interest. However, DPHHS, and this Court, have concluded, notwithstanding the Claimants' complete divestiture of property in accordance with their religious beliefs, that, actually, the Claimants retained a beneficial interest in such property.

37

Further, the Court concludes that the Colony does not actually own and control the property in accordance with its religious principles, but, rather, holds the property in trust to meet the individual needs of the Claimants, and thus, the property is "available" for Medicaid purposes.

¶72     By such conclusions, as will be demonstrated more fully by the following discussion of the Colony's documents, this Court has waded so far into religious doctrine that it purports to proclaim whether the Claimants have complied with their own religious beliefs and whether the Colony is organized in accordance with its own theology.    Like an advancing Panzer division, the Court overrides the Claimants' beliefs and announces, "*We will tell you the real meaning of your religious beliefs.*"  This Court thus declares that the Claimants did not successfully fulfill their religious obligation to completely give up their property interests, but, rather, retained an interest as beneficiaries.  An examination of the Colony's documents will only further demonstrate that this is an improper and substantial burden upon the Claimants' exercise of religion for which DPHHS has established no compelling governmental interest or justification.[3]  This Court's decision requires that the

---

[3]DPHHS contends that this Court's holding in *St. John's Lutheran Church v. State Comp. Ins. Fund* (1992), 252 Mont. 516, 830 P.2d 1271 (holding that a pastor was a church employee and not an independent contractor for purposes of the workers' compensation system), controls and that "appropriate application of Medicaid and the preservation of federal financial participation in the State's Medicaid programs are . . . 'overriding governmental interests.'"  However, in *St. John's,* this Court did not examine church doctrine or practice and there was "no internal impact or infringement on the relationship between the church and its pastor, or on their sincerely held religious beliefs." *St. John's*, 252 Mont. at 526, 830 P.2d at 1278.  Unlike *St. John's*, and as described more fully herein, religious tenet is central to the inquiry here, and there is significant impact on the Claimants' sincerely held religious beliefs.

Claimants choose between their adherence to their beliefs in the KCR community and their eligibility for Medicaid benefits–precisely the choice forbidden under *Sherbert*.

¶73    Third, the separation and neutrality analyses first given life in *Everson* must ultimately be resolved, in this context, through a careful analysis of the relationship between the Claimants and KCR, without resort to an interpretation of KCR's religious doctrine. The separation mandate does not allow government to advance religion; however, even under the application of neutral principles, the separation mandate prohibits the government from taking "a position on questions of religious belief," *Allegheny*, 492 U.S. at 594, 109 S.Ct. at 3101, 106 L.Ed.2d at 495, in order to determine benefit eligibility. Therefore, the government cannot interpret religious doctrine.

¶74    The sum of these principles offers an appropriate approach to the present case. This Court should examine, with "great care," KCR's organizational documents to see if they contain severable secular language that allows, on a "purely secular" basis, a determination whether an individual member has a claim to any church property or to church support. *Chase*, ¶¶ 13, 15. Such an analysis cannot require that members make choices that burden their religious beliefs, or which require the government to interpret religious doctrine. If a purely secular resolution can be found, then that language can determine whether the resources are available for Medicaid purposes. If an examination of the issue requires the interpretation of religious tenet, then this Court must "decline jurisdiction," *see Chase*, ¶ 15, end its inquiry and assume that the Claimants' have no property interest that is legally enforceable.

## V. A Review of the Colony's Documents

¶75     I submit that a complete, careful review of the Colony's organizational documents reveals that there is no express, secular language–severable from religious language–that defines an individual member's right to church property or church support.  To the contrary, as discussed herein, expressly *non-secular, religious* language must be considered to determine how a member is supported by the colony.  I turn to the documents, working from the general provisions to the specific.  Although the Court ignores most of these provisions, and thus fails to satisfy the *Chase* methodology, they are critical to properly resolving the case.

¶76     The "Constitution of the Hutterian Brethren Church and Rules as to Community of Property," provides, in pertinent part, as follows:

> [A]ll the Colonies of the Church adhere to and practice the teachings of the New Testament substantially as expounded by one Peter Rideman as set out in a book or work entitled, "ACCOUNT OF OUR RELIGION, DOCTRINE AND FAITH, GIVEN BY PETER RIDEMAN OF THE BROTHERS WHOM MEN CALL HUTTERIANS", and in accordance with the ways of the Hutterian Brethren *which includes community of goods*.

Recitals, paragraph 3 (emphasis added; capitalization in original).

> "Colony" means and includes a community, association, congregation or colony, incorporated or unincorporated comprised of persons who have joined together *to have, hold, use, possess and enjoy all things in common*, being all of one mind, heart and soul, according to the ways of those whom men call Hutterians . . . .

Article 1 (emphasis added).

¶77     I would note that the Colony's Constitution repeatedly emphasizes, the above provisions being two examples, that the Colony is organized to hold all property as

40

community goods. The inverse principle is also emphasized, with the Constitution providing that "[n]o individual member of a Colony shall have any assignable or transferable interest in any of its property, real or personal." Article 36. The Constitution makes clear that each member undertakes what is commonly known as a "vow of poverty." *See* Article 38. Further, if a colony is dissolved, "no individual member shall be entitled to any of the assets of the Colony . . . ." Article 44. Consistent therewith, the Bylaws provide that "no Member of the King Colony Ranch shall have vested in them any real or personal property, but the same shall be held foreever [sic] and perpetual as the Cooperative properties of the King Colony Ranch in accordance with the ordinances of the Cooperative Hutterische Church Society and its Rituals and belief in the humility of man before his Maker and God." Article VIII, Bylaws. Property can be held, therefore, only by the Colony and "in accordance with . . . the belief in the humility of man before his Maker and God."

¶78    It is clear already that the Court's decision violates the above cited language. Contrary to the Court's conclusion that the Colony holds property in trust for the individual members, "no *individual* member shall be entitled to *any* of the assets of the Colony." Article 44, Constitution (emphasis added). The property is held for the members as a collective religious society, not as individuals. The individual members have no right to the Colony's property outside the collective interests of the group as a whole, and the Court can cite to no such provision in the documents. As noted above in ¶ 60, this property arrangement was found by the Hearings Examiner to be based upon the Bible.

41

¶79    Distribution of the Colony's property, also found by the Hearings Examiner to be based on the Bible, is specifically addressed in the organizational documents:

> The objects and powers of the Church are: (a) To obtain for its Colonies and their members . . . educational and *economic assistance based upon the life and mission of Jesus Christ and the Apostles*, *in the spirit and way of the first Christian community in Jerusalem* and of the community re-established by Jacob Hutter in 1533 at the time of the origin of the "Baptisers' movement" in such a way that the members achieve one entire spiritual unit in complete community of goods . . . .

Article 3, Constitution (emphasis added). This provision demonstrates that economic assistance is provided to members "based upon the life and mission of Jesus Christ and the Apostles" and, importantly, "in the spirit and way" of the first Christian church, so that spiritual unity in a "complete community of goods" can be achieved. The Constitution later states that these "objects" (including providing economic assistance) must be carried out "by following exactly the spontaneous direction of the Holy Spirit . . . ." Article 3.

¶80    Support of individual members is also expressly addressed by the documents, which make clear that this is no promise of such individual support. "The members of a Colony shall be entitled to . . . be supported, maintained, instructed and educated by that Colony, *according to the rules, regulations and requirements of that Colony* during the time and *so long as they obey, abide by and conform to the rules, regulations, instructions and requirements of that Colony and the Church*." Article 41, Constitution (emphasis added). Thus, contrary to the Court's conclusion in ¶ 29, joining the Colony, without more, does not entitle the member to receive payment of individual expenses by the Colony. Although the Court cites to general provisions regarding property held for the benefit of the members,

42

additional, more specific language from the Colony's Constitution demonstrates that the benefit of such property is made expressly contingent upon "the rules, regulations, instructions and requirements of that Colony and the Church" and, further, upon a member's compliance with the tenets of the Church.

¶81    Further, medical expenses or any other kind of benefit which may be provided to members by the Colony are based upon religious-based discretion exercised by the Colony's governing body, a Board of Directors composed of "five (5) adult male members of Hutterische Church Society . . . ." Article VII, Articles of Incorporation. The Board has complete authority to dispose of and use church property, executed by the Colony's President, Article X, Bylaws, and must make such decisions in accordance with the tenets of the Church. Articles 39 and 47, Constitution. Thus, the decisions about individual support, including the kind of support to be provided, are made by church elders who decide such matters pursuant to church doctrine and an assessment of the life of the individual member. Articles IV and VII, Articles of Incorporation; Article 41, Constitution.

¶82    In summary, a careful review of the organizational documents leads to the clear conclusion that economic benefits are made available to the members on the basis of religious tenets. In this respect, the majority–though it draws the wrong conclusion from it–is correct when it states in ¶ 28 that the "language found within the organizing documents of KCR is internally consistent and unambiguous." Indeed, the language is carefully constructed to convey the religious purposes with which the Colony acts in all that it does. It is not possible to sever purely secular language from the documents in order to determine

43

the legal relationship between the Colony and its members, at least, without doing violence to the religious meaning therein. All property is held for the "common" or "community" good, in accordance with the belief in God. The claimants have no individual property rights in any Colony property; they have taken a vow of poverty. While they are entitled to look to the Colony for support, decisions regarding financial benefits are discretionarily made by the Colony Board in accordance with Church tenets. The Board's authority includes the right to withdraw support from a member who does not comply with Church tenets or instructions, to expel a member without compensation, or to determine what kind of support shall be provided. Even to members in good standing, economic assistance is provided "based upon the life and mission of Jesus Christ and the Apostles, in the spirit and way of the first Christian community in Jerusalem" and "following exactly the spontaneous direction of the Holy Spirit." I respectfully ask the Court: *How can an obligation conditioned upon "following exactly the spontaneous direction of the Holy Spirit" be interpreted by application of trust law?*

¶83    I submit that this is a question civil courts are not to answer. There is no express, legal trust, in favor of individual member needs, as the Court concludes. A review of the documents requires the conclusion that a member's support is a matter of faith and doctrine, including the member's good works which the organizational documents illustrate are a part of the Hutterite faith. All of the Colony's property has been donated to further these religious purposes and no express or constructive trust can be imposed by this Court to alter

those purposes. To so order is a direct contamination of the personal beliefs of the members and of the religious tenets of the Colony.

¶84 These are religious decisions, not secular. A member's support is premised upon religious principle, not secular legal obligations. This is, no doubt, why other governmental entitlement programs have already concluded that the property of Hutterite Colonies is not to be considered in determining benefit eligibility. After an examination of the organizational documents and considering the evidence herein, I would reach the same conclusion about the Montana Medicaid program. It is not the province of the civil courts to determine the Colony's obligation, founded as it is on religious principles, to the members.

## VI. A Simple Construct

¶85 This dissent inadequately captures the law of the Religion Clauses. It would take another hundred or so pages to come close to fully explaining the additional precedent and to apply the principles therefrom. This is but a summary of those principles. However, I believe the entire law of the Religion Clauses as it applies to this case can be condensed, albeit with the risk of oversimplification, to a simple construct, as follows:

¶86 A decision by this Court permitting the Claimants to collect Medicaid benefits could be said to indirectly *advance* religion because the Colony's beliefs will be respected and its financial status will not be affected by subjecting its assets to review for purposes of medical claims. Such a result is a constitutional evil because the separation principle does not permit government to advance the cause of religion. However, the alternative resolution, which the Court has chosen, is the greater constitutional evil. The Court determines that the Colony

45

has an obligation to support the Claimants individually by interpreting religious documents and doctrine, thereby taking on the role of theologian. The Court thus violates the separation principle directly and in greater measure by invading what is clearly the exclusive province of religion. The first and greatest purpose of the Establishment Clause is to prevent such governmental interference. Thus, an indirect benefit to religion must be tolerated when the alternative is entanglement with and interpretation of religious doctrine.

## VII. Conclusion

¶87    The Court applies the *Jones-Chase* formulation for intra-church property disputes inappropriately and without necessary analysis. An appropriate examination of the KCR organizational documents required by *Chase* demonstrates that they contain no severable, secular language by which the Court can rightly conclude a trust exists between KCR and the Claimants as individuals, nor does such an examination demonstrate that the Claimants have failed to fulfill their religious obligation to divest all of their property interests to the Colony. Thus, the Court's pronouncement in ¶¶ 28-29, that an express trust exists such that KCR's "resources are available for the benefit of its members" for purposes of Medicaid is incorrect. As a result, this Court violates the Claimants' religious freedom as protected under the Establishment Clause and the Free Exercise Clause of the United States Constitution and of Article II, Section 5 of the Montana Constitution.

¶88    The Court responds by raising alarm about the logical conclusion of the dissent–that "any sect–or cult–could, with the aid of a clever draftsman, qualify its members for benefits while insulating them from any requirement for qualification." *See* ¶ 42.

¶89 As an initial point, there is no indication whatsoever in the record that the Claimants, by use of a "clever draftsman" or otherwise, have fraudulently conspired to obtain Medicaid benefits by organizing a religious-based community. Some future case may involve an assertion of fraud, but this one does not. The more important point, however, is that my oath to "support, protect and defend" the Constitution does not allow me to avoid enforcement of constitutional provisions out of fear that individuals with views very different from mine may be prompted to seek those same constitutional protections.

¶90 Then, the Court, with one sentence, dismisses the content of the Colony's organizational documents by simply pronouncing that "[w]hile certainly some of the language of the Articles and By-laws is religious in tone, much of the language is secular, incorporating bedrock legal terms and principles . . . ." *See* ¶ 42. Instead of actually analyzing the documents, the Court attempts to give the impression it has done so. In this way, the Court can avoid the reality of the evidence. However, it remains clear that the Court has failed in its duty to conduct a careful review of the Colony's documents and to establish that "purely secular" language exists to resolve the issues herein. *Chase*, ¶ 15. What is the significance of the requirement, set forth in the Colony's documents, that economic assistance is to be provided to the Claimants "based upon the life and mission of Jesus Christ and the Apostles, in the spirit and way of the first Christian community?" The Court does not answer. What is the significance of the provision that support decisions are made by the Colony "following exactly the spontaneous direction of the Holy Spirit?" Again, the Court does not answer. What analysis must we provide when the documents

require all Colony decisions to be made in accordance with church doctrine? What "purely secular" language here separates the Colony's trust obligation from these religious tenets? The Court offers nothing, but simply brushes all of these issues away, without even acknowledging the significant constitutional issues that they present.

¶91    Finally, the Court references a reason for its decision that I find to be very disturbing: "the dearth of Medicaid dollars." *See* ¶ 42.  I submit that we will rue the day in which we traded religious freedom in exchange for the health of a government program.

¶92    *How can an obligation which is conditioned upon "following exactly the spontaneous direction of the Holy Spirit" be interpreted by application of trust law?*  I submit that a civil court cannot answer because of the pre-eminent principle of the Religion Clauses–separation–and I would not.

¶93    I would affirm the District Court.


/S/ JIM RICE