DA 13-0127

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2014 MT 69

NEW HOPE LUTHERAN MINISTRY, a
non-profit corporation, and THE MINORITY
MEMBERS OF THE CONGREGATION OF
FAITH LUTHERAN CHURCH OF GREAT FALLS
WHO VOTED TO REMAIN AFFILIATED WITH
THE ELCA, an unincorporated association,

        Plaintiffs, Appellees, and Cross-Appellants,

    v.

FAITH LUTHERAN CHURCH OF GREAT FALLS, INC.,
and THE FOUNDATION FOR ENDOWMENT OF
FAITH LUTHERAN CHURCH, INC., and JOHN DOES 1-25,

        Defendants and Appellants.

APPEAL FROM:    District Court of the Eighth Judicial District,
                In and For the County of Cascade, Cause No. ADV-11-586
                Honorable Greg Pinski, Presiding Judge

COUNSEL OF RECORD:

    For Appellants:

        Gregory R. Schwandt (argued), Michael P. Talia (argued), Church, Harris,
        Johnson & Williams, P.C., Great Falls, Montana

    For Appellees:

        Nathan G. Wagner (argued), J.R. Casillas, Datsopoulos, MacDonald &
        Lind, Missoula, Montana

    For Amicus:

        Timothy C. Fox, Montana Attorney General, Jon Bennion (argued),
        Assistant Attorney General, Helena, Montana

Argued and Submitted:  December 11, 2013
                          Decided:  March 12, 2014

Filed:

_____
                    Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Appellants Faith Lutheran Church of Great Falls, Inc. (Faith Lutheran) and the Foundation for the Endowment of Faith Lutheran Church, Inc. (Foundation) appeal the order of the Eighth Judicial District Court, Cascade County, denying their motions for summary judgment and granting summary judgment to New Hope Lutheran Ministry and the Minority Members of the Congregation of Faith Lutheran Church of Great Falls Who Voted to Remain Affiliated with the ELCA (collectively New Hope). The District Court's order quieted title to all property held by Faith Lutheran and the Foundation in New Hope. New Hope cross-appeals the District Court's denial of its request for prejudgment interest and attorney fees.

¶2 We restate and consider the following issues:

¶3 *1. Did the District Court err in determining that New Hope has standing to bring a claim?*

¶4 *2. Did the District Court err in determining it had subject matter jurisdiction?*

¶5 *3. Did the District Court err in determining that New Hope was entitled to the property held by Faith Lutheran?*

¶6 *4. Did the District Court err in determining that New Hope was entitled to the property held by the Foundation?*

¶7 *5. Did the District Court err in denying New Hope's request for prejudgment interest?*

¶8 *6. Did the District Court err in denying New Hope's request for attorney fees?*

¶9 We affirm in part, reverse in part, and remand for further proceedings.

3

**FACTUAL AND PROCEDURAL BACKGROUND**

¶10    Faith Lutheran was incorporated as a religious corporation in the early 1950s and has existed continuously since that time. Since its incorporation, Faith Lutheran has held certain property, including the church building, in its own name. Either at the time of incorporation or at some later point, Faith Lutheran became an affiliated church of the American Lutheran Church (ALC) denomination. In 1988, Faith Lutheran affiliated with the Evangelical Lutheran Church of America (ELCA) denomination, which was formed by the merger of the ALC, the Lutheran Church in America, and the Association of Evangelical Lutheran Churches. As part of ELCA, Faith Lutheran was organized within a regional denominational governing entity, the Montana Synod, administered at all relevant times herein by Bishop Jessica Crist.

¶11    In 1978, Faith Lutheran adopted a constitution to provide organization and governance for the church corporation. An amended constitution was adopted in 1993.[1] The 1993 constitution was the first to address Faith Lutheran's affiliation with ELCA. It provided that if the congregation desired to disaffiliate from ELCA, the congregation must first consult with the Montana Synod and then obtain a two-thirds majority vote of the members. This provision was similar to a provision in the 1978 constitution that required a two-thirds congregational vote to disaffiliate from ALC. The 1993

---

[1] The church constitution regulates day-to-day operations of the church, including who may be members, the process for the annual meeting, method and requirements for voting, etc. The 1993 constitution notes that revisions were made to the constitution in 1/91 and 1/92, while other documents reference revisions made in 1989. However, no other version of the constitution has been provided, nor have the parties referenced other versions in their briefing. Therefore, only the 1978 and 1993 constitutions are at issue here.

constitution further provided that if the congregation chose to affiliate with a different Lutheran Church body, "title to property shall continue to reside in this congregation" upon a 90% majority vote.

¶12 The Foundation was incorporated as a nonprofit corporation in 1986. The Foundation's Articles of Incorporation state that the purpose of the Foundation is "the advancement and support of activities of Faith Lutheran Church, Great Falls, Montana." The Articles provide that the Foundation "shall not be required to expend all income annually, but may accumulate it." The record does not demonstrate how the Foundation was originally funded. Regarding the period from 2001 to 2010, New Hope filed the affidavit of Wes Swenson (Swenson), treasurer for Faith Lutheran during that time, that stated a routine practice existed to transfer funds donated to Faith Lutheran without a designated purpose to the Foundation. He recalled two such donations amounting to $150,000 being transferred to the Foundation.

¶13 In 2002, the Foundation's Articles were judicially restated to eliminate individual membership and provide governance by a Board of Directors. The statement of purpose and all other provisions of the Articles relevant to this appeal were unaffected. The Board is composed of "not less than seven" persons, including: the senior pastor of Faith Lutheran; one member from Faith Lutheran's Church Council, as chosen by the Council; and other individuals elected by the members of Faith Lutheran. The Articles provide that, upon dissolution of the Foundation, all property held by the Foundation is to be distributed to "the Faith Lutheran Church Council acting for Faith Lutheran Church."

5

The Articles are silent regarding any denominational affiliation of Faith Lutheran or of the Foundation itself.

¶14 In 2009, ELCA adopted a resolution allowing men and women in committed, same-sex relationships to become ordained ministers. The pastor and some members of Faith Lutheran opposed this decision. Discussions about disaffiliating with ELCA began in January 2010, when a preliminary congregational vote was taken, and a final vote was scheduled for May 2, 2010. In April 2010, members opposing disaffiliation made a formal request for adjudication by the Montana Synod Council on the effect of the upcoming vote under Faith Lutheran's constitution. When notified of the pending adjudication, Faith Lutheran's Church Council sent correspondence to the Synod Council, including a letter from an attorney explaining its position, but voted not to otherwise participate in the Synod's process. On April 26, 2010, the Synod Council ruled that, under Faith Lutheran's 1993 constitution, a 90% vote of the congregation would be necessary "in order to keep the property. Otherwise, the constitution stipulates that the property stays with the group that remains with the ELCA."

¶15 On May 2, 2010, a congregational vote was conducted. Prior to the vote, the ruling of the Synod Council regarding the interpretation of the 1993 constitution was discussed. The election was by secret ballot, with 241 members, or 71%, voting to terminate Faith Lutheran's affiliation with ELCA and to affiliate with the Lutheran Congregations in Mission for Christ (LCMC), and 99 members, or 29%, voting to remain affiliated with ELCA. Thereafter, the majority continued as Faith Lutheran under the

6

same corporate structure, and continued its use and control over all church property. Approximately half of the minority formed the group that would ultimately become New Hope. On June 8, 2010, Bishop Crist sent a letter to Del Schmidt (Schmidt), president of the new minority group, stating the Synod Council had recognized it as an authorized worshipping community with ELCA, and appointed Tammy Bull (Bull), Associate in Ministry for Faith Lutheran before the schism, to provide pastoral services for the minority group.

¶16 New Hope filed an action seeking a declaration that the minority was the rightful owner of all church property, including property held by the Foundation, and to quiet title to the same. No other minority member has sought to intervene or filed any other claim against either Faith Lutheran or the Foundation with regard to the property.

¶17 The District Court determined that New Hope had standing to bring the claim for declaratory relief. It held that New Hope, as the minority choosing to remain affiliated with ELCA, was entitled to property held by Faith Lutheran. With regard to property held by the Foundation, the court held that the Foundation owed a fiduciary duty to the congregation of Faith Lutheran and held its property in trust for the congregation. Because the court determined that New Hope was entitled to all Faith Lutheran property, it ordered the Foundation to turn its property over to New Hope as well.

¶18 Additional facts will be included where relevant to the analysis below.

**STANDARD OF REVIEW**

¶19 We review a district court's grant or denial of a motion for summary judgment de novo, using the same M. R. Civ. P. 56 criteria applied by the district court. *Parish v. Morris*, 2012 MT 116, ¶ 10, 365 Mont. 171, 278 P.3d 1015. Summary judgment may only be granted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c); *Lorang v. Fortis Ins. Co.*, 2008 MT 252, ¶ 37, 345 Mont. 12, 192 P.3d 186. The party seeking summary judgment bears the initial burden of establishing the absence of genuine issues of material fact. *Lorang*, ¶ 37. If the moving party meets this burden, the burden then shifts to the non-moving party to "present substantial evidence, as opposed to mere denial, speculation, or conclusory statements" to establish that a genuine issue of material fact exists. *Peterson v. Eichhorn*, 2008 MT 250, ¶ 13, 344 Mont. 540, 189 P.3d 615. All reasonable inferences that may be drawn from the offered evidence should be drawn in favor of the party opposing summary judgment; however, inferences requiring a "speculative leap" are inappropriate for summary judgment. *Knucklehead Land Co. v. Accutitle, Inc.*, 2007 MT 301, ¶¶ 24-25, 340 Mont. 62, 172 P.3d 116. We review the determination that the moving party is entitled to judgment as a matter of law for correctness. *Peterson*, ¶ 13.

¶20 Whether a party has standing is a question of law, which we review de novo. *Heffernan v. Missoula City Council*, 2011 MT 91, ¶ 28, 360 Mont. 207, 255 P.3d 80. We

8

exercise plenary review over constitutional issues. *Big Sky Colony, Inc. v. Mont. Dept. of Labor & Indus.*, 2012 MT 320, ¶ 16, 368 Mont. 66, 291 P.3d 1231.

¶21 A district court's decision granting or denying prejudgment interest is a question of law which we review for correctness. *Total Indus. Plant Servs. v. Turner Indus. Group, LLC*, 2013 MT 5, ¶ 57, 368 Mont. 189, 294 P.3d 363. We review a district court's award of attorney fees for an abuse of discretion. *Jacobsen v. Allstate Ins. Co.*, 2009 MT 248, ¶ 17, 351 Mont. 464, 215 P.3d 649.

## DISCUSSION

¶22 *1. Did the District Court err in determining that New Hope has standing to bring a claim?*

¶23 Faith Lutheran offers several arguments to support its position that New Hope lacks standing to bring this action. However, if New Hope has standing under any one theory, other theories are unnecessary to address. We conclude that New Hope has organizational standing.

¶24 As an initial matter, Faith Lutheran argues that New Hope is not an entity that can be a party to this suit. New Hope originally incorporated as a religious corporation sole, declaring that all property of the corporation was owned by Bishop Crist. This action was filed by New Hope while incorporated as a religious corporation sole, but its Complaint states that New Hope is "a non-profit corporation," rather than a religious corporation. Faith Lutheran pointed out New Hope's status as a religious corporation sole in a brief supporting a motion to dismiss filed September 21, 2012. On October 1, 2012, New Hope was voluntarily dissolved as a religious corporation sole, noting that it

9

had mistakenly been designated a religious corporation sole when its incorporator, a non-attorney, selected this option because it was the only one with "religious" in the title. New Hope simultaneously re-incorporated as a religious nonprofit corporation of the same name, with members. Faith Lutheran argued for dismissal because New Hope (religious sole) had been dissolved and it was "too late" to substitute a party. New Hope responded that its correction of the corporate structure had merely brought its identity in line with its original pleading, making substitution unnecessary, and alternatively argued that substitution was permissible under M. R. Civ. P. 25 without any prejudice to Faith Lutheran. It does not appear the District Court ruled on this issue, but its entry of summary judgment in favor of New Hope implies that Faith Lutheran's motion was denied and that substitution was rendered unnecessary.

¶25 Because New Hope (religious nonprofit) was not substituted as a party for New Hope (religious sole), Faith Lutheran argues this case must be dismissed. Faith Lutheran has not provided specific authority for this position, nor any facts to demonstrate that New Hope in its current form is not the same entity as when this action was filed, other than the change in corporate designation. Faith Lutheran has demonstrated no prejudice by the manner in which New Hope corrected its corporate designation, or by the lack of a District Court order substituting the re-incorporated New Hope as a party. We decline to dismiss the case for this alleged procedural defect and turn to the issue of standing.

¶26 Standing is the question of whether a litigant is "entitled to have the court decide the merits of the dispute." *Heffernan*, ¶ 30. To have standing, the plaintiff must have a

personal stake in the outcome of the controversy at the commencement of litigation. *Heffernan*, ¶ 30. As a constitutional matter, the plaintiff must clearly allege a past, present, or threatened injury to a property or civil right, and the injury must be one that a judgment by the court could alleviate through the action. *Heffernan*, ¶ 33.

¶27 An organization may assert standing either as an entity or by the associational standing of its members. *Heffernan*, ¶ 42. As an entity, an organization may "file suit on its own behalf to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the [organization] itself may enjoy." *Heffernan*, ¶ 42. Alternatively, an organization can assert associational standing without a showing of injury to itself when "(a) at least one of its members would have standing to sue in his or her own right, (b) the interests the association seeks to protect are germane to its purpose, and (c) neither the claim asserted nor the relief requested requires the individual participation of each allegedly injured party in the lawsuit." *Heffernan*, ¶ 43.

¶28 New Hope alleges that it constitutes the minority membership of Faith Lutheran who chose to remain affiliated with ELCA and, as such, is entitled to succeed to the property owned by Faith Lutheran because, in accordance with the church's constitution, the vote to disaffiliate with ELCA was not approved by a 90% margin. Thus, it alleges an injury to itself as an organization.

¶29 Faith Lutheran offers several arguments for its position that New Hope cannot claim to be the minority ELCA faction of Faith Lutheran. These arguments essentially posit that because the vote to disaffiliate was taken by secret ballot, New Hope cannot

11

prove that any of its members voted to stay affiliated with ELCA, and even if it could, at most 48 of 99 such voters are members of New Hope.[2] However, no legal authority has been presented to support the position that in order for an organization to have standing its membership must include every person similarly injured. There is no evidence of other factions claiming to be among the original minority. The evidence supports the conclusion that New Hope is composed of approximately half of the minority, while the other half has chosen to join other churches or not to attend another church.

¶30 New Hope's claim that it constitutes the Faith Lutheran minority is supported by further evidence in the record. On April 6, 2010, Pat Goodover (Goodover) and Trudi Schmidt (Trudi) submitted formal notice to the Church Council that they had requested the Synod's interpretation of the 1993 constitution, including the 90% rule, in light of the upcoming May 2nd congregational vote. The notice stated that it was submitted by Goodover and Trudi as "represent[atives of] the members of Faith Lutheran Church who wish to remain with the ELCA," that "resolution of this issue is critical to making an informed decision by the voting members of Faith Lutheran Church about whether to vote to leave the ELCA," and that "[t]he Council of Faith Lutheran Church HAS A RESPONSIBILITY to diminish the likelihood of litigation over Faith Lutheran Church's property by making sure this issue is resolved BEFORE any vote to disassociate occurs." (Emphasis in original.)

---

[2] Although the voting was conducted secretly, members were required to sign in at the meeting to obtain a ballot. There is thus a record of individuals who received ballots, though no record of each person's vote.

12

¶31    Just after the vote on May 2, 2010, a group calling themselves "Friends of ELCA" held an organizational meeting. The minutes from this meeting indicate that 45 people were in attendance. Schmidt, Goodover, and eleven others were elected to the group's Council, with Swenson elected as treasurer, Schmidt as president, Goodover as vice-president, and Delores Goodover as secretary.[3] Faced with Faith Lutheran's claim to the church property, the group unanimously voted to "immediately file legal proceedings naming Church Council of Faith Lutheran Church, LCMC, as defendants in the property issue." Bishop Crist sent a letter dated June 8, 2010, addressed to Schmidt stating the Synod Council had recognized "the group from Faith Lutheran Church whom you represent" as an authorized worshipping community with ELCA, and that Bull was appointed as the Synodically Authorized Minister for the group.

¶32    Bull, the Associate in Ministry of Faith Lutheran prior to the May 2nd vote, was the person who first registered New Hope Lutheran Ministry as a religious corporation sole on June 16, 2011. The registered agent was Swenson. When it was re-registered as a religious nonprofit on October 3, 2012, Goodover was the registered agent. Throughout the proceedings herein, Schmidt served as president of New Hope and Goodover as vice-president.

¶33    The evidence demonstrates that New Hope is an entity composed of minority members of Faith Lutheran wishing to remain affiliated with ELCA. Though the organization has changed names and structure since the May 2nd vote, the same persons

---

[3] At least six of the members elected to the Friends of ELCA Council the day of the vote also signed the request for adjudication by the Montana Synod regarding the 90% provision.

sought to enforce their rights under Faith Lutheran's 1993 constitution before the vote, immediately following the vote, and at all times since. The New Hope organization, formed by former Faith Lutheran members who voted in the minority, has established standing to sue on its own behalf to vindicate rights, if any, originating under the 1993 constitution.

¶34 Having determined that New Hope has alleged an injury to itself, we turn to the question of whether the alleged injury is one which the courts can redress. Faith Lutheran argues that the court cannot grant relief because this action is derivative in nature and was required to be brought under Title 35, chapter 2, part 13, MCA, governing derivative actions for nonprofit corporations. Because the action was not brought under this part, Faith Lutheran argues that no other relief is available to the minority represented by New Hope. However, a derivative action may be brought by a nonprofit corporation's director or minority member "in the right of" the corporation. Section 35-2-1301, MCA. Here, New Hope is not asserting rights on behalf of the corporation, Faith Lutheran. Rather, it is asserting minority rights that came into existence on the day of the vote, were never held by Faith Lutheran, and which are contrary to the "best interests" of the corporation. *See* § 35-2-1304(1), MCA. Further, members bringing a derivative suit "must be a member at the time of the proceeding." Section 35-2-1301(2)(b), MCA. New Hope is composed of former members of Faith Lutheran, not current members. This action is more appropriately viewed as one asserting

14

dissenter's rights.  *See e.g. Hansen v. 75 Ranch Co.*, 1998 MT 77, 288 Mont. 310, 957 P.2d 32.

¶35    New Hope filed this action seeking a declaratory judgment regarding its legal rights in property held by Faith Lutheran and by the Foundation, pursuant to Faith Lutheran's 1993 constitution.  Section 27-8-202, MCA, of the Uniform Declaratory Judgments Act provides:

> Any person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

Unless otherwise prohibited, as discussed below, a court could render an effective judgment by a declaration of the respective rights of New Hope and Faith Lutheran under Faith Lutheran's constitution.  We thus affirm the District Court's ruling that, having alleged an injury to itself as an organization that the court could alleviate, New Hope has standing to proceed.

¶36    *2. Did the District Court err in determining it had subject matter jurisdiction?*

¶37    Faith Lutheran argues the District Court erred by exercising jurisdiction over the subject matter of this case.  Faith Lutheran asserts that this action involves "an intra-membership ecclesiastical dispute" that cannot be resolved by the civil judicial system without violating the First Amendment's Free Exercise and Establishment clauses.

¶38 "The States have a legitimate interest in the peaceful resolution of property disputes, and their civil courts are generally proper forums for such resolution." *Second Intl. Baha'i Council v. Chase*, 2005 MT 30, ¶ 13, 326 Mont. 41, 106 P.3d 1168 (citing *Jones v. Wolf*, 443 U.S. 595, 602, 99 S. Ct. 3020, 3024-25 (1979)). As the United States Supreme Court noted, "[r]eligious organizations come before us in the same attitude as other voluntary associations for benevolent or charitable purposes, and their rights of property, or of contract, are equally under the protection of the law, and the actions of their members subject to its restraints." *Watson v. Jones*, 80 U.S. 679, 714 (1872). However, disputes over church property pose special problems. When considering disputes over property of religious organizations, courts "must exercise great care to avoid resolving such disputes on the basis of religious doctrine or practice." *Chase*, ¶ 13 (citing *Presbyterian Church v. Mary Elizabeth Blue Hull Meml. Presbyterian Church*, 393 U.S. 440, 449, 89 S. Ct. 601, 665 (1969); *Jones*, 443 U.S. at 602, 99 S. Ct. at 3025).

¶39 The United States Supreme Court has recognized two approaches for resolving disputes involving church property, although it has not characterized these approaches as exclusive. *Chase*, ¶¶ 16, 18. Under the first approach, civil courts may defer to a determination made by an established decision-making body of a "hierarchical church." *Chase*, ¶ 16. A court thus "avoids entanglement in ecclesiastical controversy by accepting the judgment of the established decision-making body of the religious organization." *Chase*, ¶ 16. This "deferential approach" is most readily employed when there is no dispute between the parties regarding either the hierarchical nature of the

16

church or the identity of the decision-making body. *Chase*, ¶ 16 (citing *Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244, 1248 (9th Cir. 1999)). "[W]hen either is disputed on the basis of religious doctrine, however, the resolution of these threshold questions may require a court to intrude impermissibly into religious doctrinal issues." *Chase*, ¶ 16.

¶40 Alternatively, a court may pursue a "neutral principles approach" to resolve a dispute over church property by applying

> neutral, secular principles of property, trust, and corporate law when instruments upon which those principles operate are at hand. Thus, no First Amendment issue arises when a court resolves a church property dispute by relying on state statutes concerning the holding of religious property, the language of relevant deeds, and the terms of corporate charters of religious organizations. *Maktab*, 179 F.3d at 1249 [citation omitted]. "The key inquiry is whether church documents . . . contain express, secular language indicating what is to happen to church property in the event of a particular contingency . . . . If the documents do contain express, secular language, separable from the non-secular language, then that language dictates the outcome."

*Chase*, ¶ 17 (quoting Laurence H. Tribe, *American Constitutional Law* § 14-11, at 1238 (2d ed., Found. Press 1988)).

¶41 Faith Lutheran argues that because it disputes the validity of the 1993 constitution, courts are precluded from applying a neutral approach to this dispute. It cites *In re Hofer*, 2005 MT 302, ¶ 25, 329 Mont. 368, 124 P.3d 1098, for the proposition that a neutral principle approach is only permissible "where the church organizational documents *are undisputed*." (Emphasis added.) However, that position is not supported by *In re Hofer*. We have not previously been asked to decide an issue where a church's governing

17

documents themselves were disputed. In both *Chase* and *In re Hofer*, we were presented with undisputed church documents. However, we did not restrict our jurisdictional inquiry under the neutral approach to only cases involving undisputed documents. Concerns about a disputed decision-making process have been more commonly expressed in the context of the deferential approach. *See Chase*, ¶ 16 ("This approach is most easily employed when there is no dispute between the parties concerning the hierarchical nature of the church or the identity of its decision-making body . . . ."). Nothing in our prior cases precludes us from utilizing a neutral approach to a church property dispute, including an underlying dispute over church documents, if resolution under neutral principles is possible.

¶42 In *Chase*, we were presented with the question of whether the civil courts could exercise jurisdiction over an action brought by the Second International Baha'i Council against Chase, the president of the Council, alleging wrongful interference with the conduct of the church corporation and conversion of corporate property. *Chase*, ¶ 7. The district court dismissed the action for lack of jurisdiction on First Amendment grounds. *Chase*, ¶ 8. We reversed, holding that a "purely secular" reading of church documents permitted the dispute to be resolved on the merits with neither an inquiry into Baha'i religious doctrine nor intrusion into "private consciences." *Chase*, ¶ 24. We held that "[t]he First Amendment does not preclude the District Court's consultation of corporate bylaws, state statutes, and general corporate and property law to determine" issues of church property. *Chase*, ¶ 26.

18

¶43   *In re Hofer* required a determination of whether the bylaws and Articles of Incorporation of a Hutterite Colony created a trust over Colony property for the benefit of its members.  Relying on our analysis in *Chase*, we held that the First Amendment was not violated by a neutral principle approach applying property, trust, and corporate law to the Articles, bylaws, and constitution of the Colony.  *In re Hofer*, ¶ 25.

¶44   Consistent with these holdings, we conclude that a dispute over church documents susceptible to application of neutral principles may likewise be resolved by a court using the neutral approach.  The challenge raised here by Faith Lutheran to the validity of the 1993 constitution does not require us to delve into doctrinal matters, and only separate, secular language is used.  Resolution is possible under application of neutral principles of contract, trust, and corporate law.  Thus, no First Amendment concern is raised that would prohibit a court's exercise of jurisdiction over the dispute.  We reach the same conclusion regarding the dispute over application of the 90% provision, which provides as follows:

> If a 90% majority of the voting members of this congregation present at a regularly called and conducted special meeting of this congregation vote to transfer to another Lutheran Church body, title to property shall continue to reside in this congregation.  Before this congregation takes action to transfer to another Lutheran Church body, it shall consult the representatives of the Montana Synod.

Nothing in this provision requires the court to delve into religious doctrine.  Its operation turns on language that is purely secular and presents no potential for doctrinal entanglement.  We are not here asked to determine who qualifies as a "voting member."

19

The dispute before us can be resolved by application of neutral legal principles, and we turn to these disputed issues.

¶45 Faith Lutheran contends that the 1993 constitution was not properly adopted, particularly the 90% provision, and that only the 1978 constitution was valid at the time of the May 2, 2010 vote. It points to the requirement of the 1978 constitution that amendments are adopted after (1) an announcement of proposed changes at a public service or by mailing to voting members 30 days before the annual meeting; (2) approval by a majority vote at the first annual meeting after the proposed changes are announced; and (3) ratification of the amendments at the subsequent annual meeting with a two-thirds vote by written ballot. Faith Lutheran contends there is no proof the final vote on the 1993 constitution was either conducted by written ballot or passed by a two-thirds vote, because the minutes from the annual meeting only note that a motion was made to accept the amendments and that it was "seconded and carried." Faith Lutheran provided an affidavit from Lorraine Severson, secretary of Faith Lutheran at the time the two subject annual meetings were conducted. Severson states:

6. To the best of my knowledge and belief, there was no voting by ballot on the proposed Constitutional amendments at either the 1989 or the 1990 annual meeting of Faith Lutheran.

7. The votes for and the votes against were not recorded for either the 1989 vote or the 1990 vote. Thus, I cannot say with regard to the 1990 vote whether or not the motion passed by a 2/3rds majority.

8. If there had been a motion to forego a written ballot for either or both votes, that would have been included in my meeting minutes. There was no such motion to forego a written ballot at either meeting.

20

9. If there had been a ballot vote, I would have recorded the outcome of the ballot vote in the minutes, noting the number voting for and the number voting against the amendments.

¶46 It is notable that Faith Lutheran failed to object to the 1993 constitution at any time prior to New Hope's filing of this action. Despite the attention brought to the constitution during the Synod's adjudication process, and the congregational discussion about the Synod's decision prior to the May 2, 2010 vote, no objection was raised then or at any time in the many years after its adoption. Faith Lutheran's position during the Synod adjudication was not that the constitution was invalid, but that the 90% provision did not apply because the "2/3 required to leave the ELCA in essence trumped the 90% [provision]." The challenge to its validity was not raised until nearly one year after New Hope filed this action. The significant lapse in time between the allegedly defective process in the constitution's adoption and Faith Lutheran's objection to it raises two longstanding maxims: "Acquiescence in error takes away the right of objecting to it," § 1-3-207, MCA, and "[t]he law helps the vigilant before those who sleep on their rights," § 1-3-218, MCA.

¶47 New Hope provided hundreds of pages in exhibits dating from 1988 to 1993, including Church Council meeting minutes addressing the discussion regarding this provision and other amendments;[4] a letter to the congregation with the proposed changes

---

[4] For example, the November 3, 1988 minutes note that the bylaw committee reported on, and the council discussed, the "change from 2/3 majority to 90%."

21

including the new 90% provision;[5] various drafts of the changes;[6] two consecutive annual meeting minutes where it is noted that the amendments were voted on and passed;[7] the letter sending the amended constitution to the Montana Synod;[8] and Montana Synod correspondence discussing the changes.[9]

¶48 New Hope presented substantial evidence demonstrating that the revisions culminating in the 1993 constitution, including the 90% provision, were discussed over a period of several years, processed through the myriad steps for approval as required by the 1978 constitution, and thereafter utilized by Faith Lutheran for some 20 years. Relevant here is the law's recognition of a presumption, disputable, that the ordinary

---

[5] The letter is dated December 29, 1988, from Pastor Stan. It notes that only portions of the constitution with proposed changes are attached, with both the old and new versions. Page 5 of the new version includes the current 90% provision.

[6] Various drafts show different dates on the front cover including "1978-Revised 1989," "1978-Revised 1992 and 1993," but each includes the 90% provision. The current version of the constitution presented by New Hope states on the front page: "The content of the constitution and bylaws is as previously written with ratified revisions of constitution (1/92) and of bylaws (1/91 and 1/92)."

[7] The January 29, 1989 minutes note that, after a few amendments unrelated to the 90% provision, a "[m]otion to accept the proposed constitution changes as presentd [sic], and as amended, [was] seconded and carried." The January 21, 1990 minutes note under "unfinished business" that "Dorothy Sowa moved we accept the constitution as previously amended. Motion seconded and carried."

[8] This is a handwritten note, dated "3-12" but without a year, from Peggy Dean, past secretary of Faith Lutheran. It states: "Here are the changes made to the Faith Lutheran Constitution over the past two years. I think I should have sent them sooner but didn't think about it until I cleaned by books at the end of my term." New Hope alleges this was sent in March of 1993.

[9] An April 3, 1993 letter from Hugo Eskildsonn addressed to Rev. Jessica Crist notes "In C9.03 a 90% majority is mentioned as a requirement for transfer to 'another Lutheran church body' although in C9.04 only a 'two-thirds majority' is cited for transfer to a non-Lutheran church body."

course of business was followed. Section 26-1-602(20), MCA. After New Hope presented this evidence, the summary judgment burden shifted to Faith Lutheran to present substantial evidence in opposition, rather than mere denial, conclusory statements, or speculative evidence. However, the affidavit submitted by Faith Lutheran does not affirmatively state that a two-thirds majority vote approving the 1993 constitution was not obtained, but only that the affiant could not verify that it had passed by a two-thirds majority because the numbers were not recorded. Likewise, the affidavit does not affirmatively aver that a ballot vote was not taken, but merely raises a question about the method of balloting due to a lack of information in the minutes. In order to meet its evidentiary burden, and dispute the presumption of regularity, Faith Lutheran had to do more than point to a lack of detail in meeting minutes from 20 years ago. At best, Faith Lutheran's evidence can be viewed as raising questions, but failing to raise a genuine issue of material fact about the approval of the 1993 constitution. We are not persuaded by Faith Lutheran's reliance on a lack of detail in the aged minutes, and thus conclude it has failed to meet its burden.

¶49 Further, as the District Court noted, Faith Lutheran itself relied on the provisions of the 1993 constitution allowing it to vote to withdraw from ELCA, provisions that were not present in the 1978 constitution.[10] After relying on portions of the 1993 constitution

___

[10] We acknowledge Faith Lutheran's contention that it was impossible for the 1978 constitution to make reference to ELCA, as the ELCA was not created until 1988. However, this does not negate the fact that the 1993 constitution is the only constitution that references the ELCA. All references in the 1978 constitution to the ALC, a non-existent entity as of 1988, would have been of questionable validity at the time of the disaffiliation vote. Without some other governing

23

for its own purposes, Faith Lutheran now asks us to invalidate it. This we decline to do. *See* § 1-3-212, MCA ("A person who takes the benefit shall bear the burden.").

¶50 Having concluded that a neutral principles approach is appropriate for resolution of both the challenge to the validity of the 1993 constitution and its interpretation, we affirm the District Court's exercise of jurisdiction, and its determination that the 1993 constitution is valid, when it entered summary judgment. We thus turn to interpretation of the constitution.

¶51 *3. Did the District Court err in determining that New Hope was entitled to the property held by Faith Lutheran?*

¶52 Faith Lutheran's 1993 constitution begins in Chapter 1 by explaining that, throughout the constitution, the Faith Lutheran corporation is referred to as "the congregation," and that, for purposes of the document, "members of this corporation, and members of the congregation of the Faith Lutheran Church of Great Falls, are hereby declared to be one and the same." This establishes an initial point of interpretation: that references made in the constitution to "the congregation" are meant to refer to the Faith Lutheran corporate entity.

¶53 Chapter 5 of the constitution provides for affiliation of Faith Lutheran with ELCA, and also explains how Faith Lutheran can disaffiliate with ELCA. C5:04 provides that Faith Lutheran's affiliation with ELCA may be terminated if the congregation dissolves, ceases to exist, is removed from membership with ELCA through disciplinary action, or

---

document dictating the procedure for withdrawal from ELCA, Faith Lutheran's actions in conducting preliminary and final votes to disaffiliate, as well as submitting its decision to the ELCA, as required by the 1993 constitution, could well have been superfluous.

24

if the congregation follows the disaffiliation procedure set forth in Chapter 5 (C5:05). The procedure for voluntary disaffiliation from ELCA provided in C5:05 requires an initial two-thirds vote of the voting members to pass a "resolution indicating the desire" to terminate, followed by additional steps that culminate in a second vote to disaffiliate requiring a two-thirds majority.

¶54    Chapter 9 governs "legal ownership" of church property.    It provides for disposition of church property under various circumstances, pertinent here being Faith Lutheran's affiliation with "another Lutheran Church body."  That provision states:

> If a 90% majority of the voting members of this congregation present at a regularly called and conducted special meeting of this congregation vote to transfer to another Lutheran Church body, title to property shall continue to reside in this congregation.  Before this congregation takes action to transfer to another Lutheran Church body, it shall consult the representatives of the Montana Synod.

¶55    It is undisputed that a 71% majority voted to disaffiliate with ELCA and to transfer to another Lutheran Church body.  A 90% majority was not obtained.  We disagree with Faith Lutheran's argument that, in order for the 90% provision to apply at all, the congregation was required to conduct a separate vote on the specific issue of future ownership of the church property.  This section contemplates only a vote on affiliation, with the disposition of church property made dependent upon the vote margin. Faith Lutheran offers the alternative argument that, even if the 90% provision is applicable, New Hope is not entitled to the church property because the provision doesn't specifically explain how the property is disposed if a 90% majority is not obtained, leaving a multitude of dispositional options for the property.  To the contrary, we agree

25

with the District Court's conclusion that, under neutral principles of contract interpretation, the provision dictates that when a vote falls between two-thirds and 90% support, "both contingencies have not been met" for the title of the property "to reside in this congregation," meaning, as explained above, the Faith Lutheran corporation. Although a 71% majority vote in favor of a new affiliation is successfully carried, title to church property in that instance is not retained by the corporation, which must divest itself of the property in favor of the minority that have chosen to remain affiliated with ELCA, here represented by New Hope. Faith Lutheran's retention of its corporate identity does not change the fact that it is the disaffiliating faction. While the provision is not a model of clarity or completeness, when read together with the other constitutional provisions governing property ownership, it dictates this outcome. We therefore affirm the District Court's determination that New Hope was entitled to the property owned by Faith Lutheran as of May 2, 2010.

¶56    *4. Did the District Court err in determining that New Hope was entitled to the property held by the Foundation?*

¶57    The District Court concluded the Foundation owed a fiduciary duty to the church and held its property in trust for Faith Lutheran, although it provided little substantive analysis explaining why this was so. After so determining, it ruled that the 90% provision dictated that New Hope was entitled to all property held by the Foundation and ordered such property transferred outright to New Hope.

¶58    New Hope's position on appeal is that the Foundation is "an asset that belonged to the congregation," and that the *cy pres* doctrine would support this result, even if the

26

District Court did not cite or rely on the doctrine. The Foundation argues that reversal is required because the District Court raised the trust/fiduciary duty theory *sua sponte* and the Foundation had no opportunity to respond. It further argues that reversal is required because it is a separate corporate entity that has the authority to amend its Articles at any time, including its corporate purposes, which necessarily negates any claim of interest by New Hope or other congregants.

¶59 We disagree that the District Court's theory was raised *sua sponte* and without notice. "[D]ue Process requires a reasonable notice as to give everyone interested their opportunity to be heard." *Baston v. Baston*, 2010 MT 207, ¶ 18, 357 Mont. 470, 240 P.3d 643 (citation omitted). A review of the record shows that New Hope raised fiduciary duty and trust theory in its pleadings and briefings to adequately put the Foundation on notice of a trust claim. New Hope asserted in its First Amended Complaint that the Foundation possessed property belonging to Faith Lutheran and argued in summary judgment briefing that "the Foundation is holding title to property in trust for the benefit of Faith Lutheran Church." Additional arguments concerning trust theory were also made by New Hope. While raising a trust issue generally, New Hope did not specifically allege a resulting or constructive trust in the District Court, nor does so here. Likewise, the District Court's order did not indicate what kind of trust it was finding. It appears that the court concluded that an express trust existed.

¶60 The party asserting "the existence of a trust has the burden of proving its existence and contents by clear, unmistakable, satisfactory and convincing evidence." *In re Hofer*, ¶ 28. Under the trust law in effect at the time of the disaffiliation vote, an express trust could be created by "a declaration by the owner of property that the owner holds the property as trustee" or "a transfer of property by the owner during the owner's lifetime to another person as trustee." Section 72-33-201, MCA (2009). A trust could be created "only if the trustor properly manifests an intention to create a trust," § 72-33-202, MCA (2009), and was subject to the requirements of the statute of frauds if not created by operation of law, § 72-33-208, MCA (2009). These same basic requirements are contained in the current Montana Uniform Trust Code. *See* §§ 72-38-401, -402(1)(b), -407, MCA.

¶61 The court relied on two provisions of the Foundation's Articles in concluding that a trust existed. First, Article V of the Foundation's Articles provides that the purpose of the Foundation is "[t]o use and apply funds and property for the advancement and support of activities of Faith Lutheran Church, Great Falls, Montana." Second, Article IX provides that, in the event of dissolution of the Foundation, the Foundation's property is to be "distributed to the Faith Lutheran Church Council acting for Faith Lutheran Church for the purpose of providing financial assistance to the Faith Lutheran Church, Great Falls, Montana."

¶62 While these provisions demonstrate that the Foundation's purpose is to benefit Faith Lutheran Church, they do not negate the fact that the Foundation is a separate,

28

stand-alone entity organized under the laws of this state as a nonprofit corporation. *See* Articles IV, V (The period of existence of the Foundation "shall be in perpetuity." The Foundation "shall have and exercise all powers conferred by the law of the state of Montana upon corporations formed under the Montana Non-Profit Corporation Act."). The formal provisions here are distinguished from those at issue in our cases concluding that an express trust existed. *See e.g. McCaffrey v. Laursen*, 215 Mont. 305, 697 P.2d 103 (1985) (express trust found where father deeded property to son and son simultaneously signed a document agreeing that all income from property belonged to father, to reconvey property on demand of father, and that property would be considered an asset of father's estate upon his death); *In re Hofer*, ¶ 26 (trust found where bylaws of religious corporation stated that all property of the corporation "shall be held in the name of [the corporation] for the sole benefit of the Members . . . and for their natural heirs and successors."). Further, although New Hope argues that the Foundation's purpose and property was to serve "the congregation"—meaning the individual members of Faith Lutheran—that purpose is not stated in the Foundation's Articles. Rather, the Articles declare support for Faith Lutheran church, and, in any event, we have already established that "the congregation" as defined in Faith Lutheran's corporate documents means the singular Faith Lutheran corporation, solidifying that the Foundation's purpose was to benefit that particular corporate entity, which continued to exist after the disaffiliation vote. As amicus Attorney General argues, to permit the particularly stated charitable purposes of a nonprofit corporation to be malleably converted into an express trust for

29

unnamed beneficiaries, and then its property transferred outright to those beneficiaries, could negate much of the substance of the Nonprofit Corporation Act.

¶63 We further reject New Hope's argument that the District Court's decision can be supported by the *cy pres* doctrine. As then codified, the *cy pres* doctrine provided:

> If property is given in trust to be applied to a particular charitable purpose, and it is or becomes impossible, impracticable, or illegal to carry out the particular purpose, and if the trustor manifested a general intention to devote the property to charitable purposes, the trust need not fail. The court may direct the application of the property to some charitable purpose which falls within the general charitable intention of the trustor.

Section 72-33-504, MCA (2009) (repealed and replaced by § 72-38-413, MCA (2013)). New Hope argues that the Foundation's purpose has become impracticable following the schism because donations were given at a time when Faith Lutheran was associated with ELCA. First, application of the *cy pres* doctrine requires the existence of a trust and does not operate to convert a nonprofit corporation into a trust. We have already determined that no trust has been established here, but further, the Foundation's charitable purposes have not here become "impossible, impracticable, or illegal to carry out." Section 72-33-504, MCA (2009). The *cy pres* doctrine is inapplicable in these circumstances.

¶64 The issue then becomes whether the Foundation's Articles contain any provisions addressing the consequences of a decision by Faith Lutheran to disaffiliate from ELCA upon the Foundation or its property. There are none. The District Court reasoned that "[i]f Faith Lutheran had followed the decision of the Synod Council th[e]n the assets of the Foundation would have remained appropriately for the benefit of the faction that voted to stay affiliated with the ELCA." However, no mention of ELCA or of Faith

30

Lutheran's denominational affiliation is made by the Foundation's Articles. While Faith Lutheran was affiliated with ELCA for much of the Foundation's existence, the Foundation predates Faith Lutheran's affiliation with ELCA to the time when Faith Lutheran was affiliated with ALC. A reading of the plain language of the Articles demonstrates that, absent amendment, the Foundation is tied to Faith Lutheran without regard to its denominational affiliation. Similarly, no provision addresses the consequences of any schism or incorporates the constitutional provisions of Faith Lutheran with regard to any other contingency.

¶65 The Foundation's designated purpose, to benefit Faith Lutheran Church of Great Falls, is still capable of being carried out. Faith Lutheran Church of Great Falls has continued and can be traced as an ongoing entity. As an independent entity, the Foundation retains discretion over the use and control of its property, subject to the limitations of its Articles and of the Nonprofit Corporation Act.

¶66 We recognize that New Hope presented evidence that a significant portion of funds held by the Foundation came directly from Faith Lutheran, rather than from private donors, that the Foundation gave reports to Faith Lutheran during its annual meetings, and that all Board members were either representatives of Faith Lutheran or elected by Faith Lutheran. However, such evidence, without more, does not require creation of an express trust. While this evidence may have been relevant to a resulting or constructive trust theory, or a "piercing the corporate veil" theory, neither was raised in this litigation.

31

¶67 We reverse the District Court's order declaring that the Foundation held its property in trust for Faith Lutheran and directing it to transfer all property to New Hope.

¶68 *5. Did the District Court err in denying New Hope's request for prejudgment interest?*

¶69 New Hope appeals from the District Court's denial of prejudgment interest on the property it was awarded. The District Court concluded that, because New Hope's action was for declaratory judgment and quiet title, the gravamen of the action was in ownership, not money damages, preventing application of § 27-1-211, MCA.

¶70 The primary objective of the prejudgment interest statute is to "'fully compensate the injured party for the loss of use of his money during the period in which a valid claim was not paid.'" *Kraft v. High Country Motors, Inc.*, 2012 MT 83, ¶ 71, 364 Mont. 465, 276 P.3d 908 (quoting *Byrne v. Terry*, 228 Mont. 387, 391, 741 P.2d 1341, 1343 (1987)). If the party requesting prejudgment interest satisfies the criteria under § 27-1-211, MCA, an award of interest is not discretionary. *Kraft*, ¶ 71. Three criteria must be satisfied: (1) an underlying monetary obligation; (2) amount of recovery is certain or capable of being made certain; and (3) right to recover must vest on a particular day. *Kraft*, ¶ 70.

¶71 New Hope does not contend that it is entitled to prejudgment interest on the value of the real property, merely on the monetary amounts held in bank accounts or certificates of deposit it was entitled to following the May 2, 2010 vote. Given our determination that New Hope was entitled to the property held by Faith Lutheran following the schism, New Hope has established that it is entitled to an underlying monetary obligation. The amount in Faith Lutheran's financial accounts as of May 2,

32

2010, is undisputed to be $95,744.00, thus the amount of recovery is certain. Finally, New Hope's right to recover this amount vested on May 2, 2010, following the majority faction's disaffiliation from ELCA. New Hope can satisfy the requirements for prejudgment interest, and was denied the use of this money during the pendency of this case by Faith Lutheran's refusal to relinquish control over it. Thus, New Hope is entitled to an award of prejudgment interest pursuant to § 27-1-211, MCA, in order to fully compensate it.

¶72    New Hope also requested post-judgment interest; however, the District Court never ruled on this request. Post-judgment interest is not merely awarded in the discretion of the court, but is a statutory right. *In re Marriage of Pospisil*, 2000 MT 132, ¶ 49, 299 Mont. 527, 1 P.3d 364 (citing § 25-9-205, MCA). Thus, New Hope is entitled to post-judgment interest on the $95,744 owed to it by Faith Lutheran since the date of the District Court's order, excepting any period during which the "debtor is prevented by law" from paying the debt.[11] *Pospisil*, ¶ 51.

¶73    The District Court's order on prejudgment interest is reversed. Upon remand, pre- and post-judgment interest on the $95,744 award must be calculated.

¶74    *6. Did the District Court err in denying New Hope's request for attorney fees?*

¶75    Under § 27-8-313, MCA, a District Court may award attorney fees to a prevailing party in a declarative relief action "if equitable considerations support such an award."

---

[11] The District Court entered a temporary stay of execution pending resolution of post-judgment motions, and another contingent upon posting of a supersedeas bond. Generally, no interest accrues during the pendency of appeal when a stay of execution is in place. *Pospisil*, ¶ 51 (citing § 27-1-211, MCA).

*Hughes v. Ahlgren*, 2011 MT 189, ¶ 13, 361 Mont. 319, 258 P.3d 439. The award of attorney fees under this section is the exception, rather than the rule. *Western Tradition Partn. v. Atty. Gen. of Mont.*, 2012 MT 271, ¶ 11, 367 Mont. 112, 291 P.3d 545. We have applied a "tangible parameters" test to determine whether an award of attorney fees is necessary and proper. *Hughes*, ¶ 13. However, before applying the tangible parameters test, the court must conclude that equity supports an award of attorney fees. *Hughes*, ¶ 13 (citing *United Natl. Ins. Co. v. St. Paul Fire & Ins. Co.*, 2009 MT 269, ¶ 38, 352 Mont. 105, 214 P.3d 1260). "Equity generally does not support an award of attorney fees under [the Uniform Declaratory Judgment Act], however, if similarly situated parties genuinely dispute their rights." *Hughes*, ¶ 16 (citing *United Natl. Ins.*, ¶ 39).

¶76 The District Court disagreed with New Hope's argument that this case involved "very straightforward" facts. We agree with the District Court that this case involved a genuine dispute between the rights of the parties that required complex legal analysis of competing claims. We also agree with the District Court's assessment that the parties were not unequal in their respective status or position. Though Faith Lutheran comprises a majority faction as opposed to New Hope's minority, the parties were similarly situated and both were, as noted by the District Court, "exceptionally well represented by competent legal counsel in the face of settled, but uncommonly litigated, law." Therefore, we conclude there was no abuse of discretion in the District Court's denial of New Hope's request for attorney fees.

34

**CONCLUSION**

¶77 The District Court correctly determined that New Hope had standing to bring this action. New Hope alleged an injury to itself as an organization that the courts could alleviate, and was not required to file a nonprofit derivative action against Faith Lutheran because the claims here were not brought on behalf of the church corporation. The District Court also correctly determined that subject matter jurisdiction could be exercised, despite the religious nature of the parties, by application of neutral principles of law to the church governing documents.

¶78 Applying neutral principles of law, the District Court correctly determined that New Hope, representing the minority members, was entitled to property held by Faith Lutheran as of the date of the disaffiliation vote because the 90% super-majority necessary for Faith Lutheran to retain the property under the constitution was not obtained. However, the District Court erred by holding that New Hope was entitled to the Foundation's property because New Hope failed to prove that an express trust existed over Foundation property in favor of the church members, or otherwise establish that New Hope was entitled to the Foundation's property.

¶79 Because New Hope was entitled to all Faith Lutheran property as of the disaffiliation vote, including cash accounts, the District Court erred in denying prejudgment interest to New Hope for the loss of use of those monetary amounts. New Hope is likewise entitled to post-judgment interest on these funds. Finally, the court did not abuse its discretion in denying New Hope's request for attorney fees.

35

¶80   Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.


/S/ JIM RICE

We concur:


/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ JON A. OLDENBURG
District Court Judge Jon Oldenburg
sitting in for Justice Laurie McKinnon
/S/ GREGORY R. TODD
District Court Judge Gregory R. Todd
sitting in for former Justice Brian Morris